UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---------------------------------------------------------------- x

In re: )
 ) Chapter 11
**BIOFUEL INDUSTRIES GROUP, LLC,** ) Case No. 11-_____
 ) Hon. _____
 Debtor. )

---------------------------------------------------------------- x

### MOTION OF THE DEBTOR AND DEBTOR IN POSSESSION FOR ENTRY OF:

**(I)**  **A "SALE PROCEDURES ORDER" (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING CERTAIN BIDDING PROTECTIONS, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE BIDDING PROCEDURES HEARING, THE AUCTION AND THE SALE HEARING, AND (D) SCHEDULING AN AUCTION AND THE SALE HEARING; AND**

**(II)**  **A "SALE APPROVAL ORDER" AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES EXCEPT FOR CERTAIN ASSUMED LIABILITIES**

**Biofuel Industries Group, LLC,** debtor and debtor-in-possession herein (the "Debtor"), by and through its counsel, Carson Fischer, P.L.C., hereby moves the Court, pursuant to sections 105(a), 363(b), and 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), for entry of an order in the form attached hereto as **Exhibit 1-A** (the "Bidding Procedures Order"):

(a) authorizing and approving the Bidding Procedures (as defined herein) for the

sale of substantially all of the Debtor's (the " Purchased Assets");

(b) approving certain bidding protections;

(c) approving the form and manner of notice of an auction (the "<u>Auction</u>") and a final sale hearing (the "<u>Sale Hearing</u>"), substantially in the form of **Exhibit 5** (the "<u>Sale Process Notice</u>"); and

(d) scheduling the Auction and the Sale Hearing.

The Debtor also hereby moves the Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, for entry of an order attached hereto as **Exhibit 1-B** (the "<u>Sale Order</u>") authorizing the sale of the Purchased Assets to the Purchaser (as defined below) or such other party that is the successful bidder at the Auction, free and clear of liens, claims and encumbrances except for certain assumed liabilities.

In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.      On May 23, 2011 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Bankruptcy Case</u>").  The Debtor is continuing to operate its business as debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

3.     No official committee of unsecured creditors has been appointed in the Bankruptcy Case (the "Committee").  No trustee has been appointed in the Bankruptcy Case.

4.     The Debtor is a limited liability company that was organized under the laws of the State of Michigan.  Debtor's membership interests are owned (i) 50% by NextFuels, LLC, the sole voting member of the Debtor, and, (ii) 50% by approximately 55 different individuals and entities, which are non-voting members.

5.     Prior to discontinuing its regular operations in July 2010, the Debtor, doing business as NextDiesel, produced and distributed biodiesel fuel and related products primarily in Michigan.  The Debtor was founded in 2005 and is based in Adrian, Michigan.

6.     The Debtor owns a 30,000 square foot facility, located on a 25-acre land parcel, which includes an on-site state-of-the-art test lab, sophisticated environmental and fire suppression systems, and highly automated processing equipment that does not emit greenhouse gases and uses only minimal water during biodiesel production. The facility was equipped for an initial production capacity of 10 million gallons per year, with the ability to increase capacities to meet the growing demand for renewable fuels.

7.     While not presently operating, the Debtor's facility is being maintained in a "hot idle" state to maintain the machinery and equipment and protect future production.

8.    The Debtor is a party to commercial mortgage loans and term loans (together with all other related agreements and documents, collectively, the "Prepetition Credit Documents") with Citizens Bank ("Citizens").

9.    The obligations under the Prepetition Credit Documents are secured by a first priority lien and security interest in substantially all of Debtor's assets.  As of approximately the Petition Date, the total outstanding principal amount owed to Citizens under the Prepetition Credit Documents was approximately $9,821,000 (the "Prepetition Indebtedness").

## THE PROPOSED SALE

10.    Prior to the Petition Date, since approximately early 2009, the Debtor has been exploring strategic alternatives to restructure the Debtor's business operations, including a potential sale of the Purchased Assets.

11.    The Debtor considered a number of potential sales and restructuring alternatives in order to develop a plan that would maximize value for its creditors and/or to ensure the long-term continuity of its business.  In this regard, the Debtor's members and representatives engaged in discussions with more than 30 prospective parties, including, strategic partners, investors, and buyers, to determine their interest in pursuing a transaction with the Debtor.

12.    Due to liquidity concerns and in an effort to maximize the value of the Debtor's estate, the Debtor has determined, after the exercise of due diligence and in the exercise of the Debtor's sound business judgment, to enter into an Asset Purchase Agreement dated May 20, 2011 (the "APA") with LQM Ventures LLC, for itself or on

4

behalf of an affiliate to be formed (the "Purchaser") pursuant to which Purchaser has agreed to act as a stalking horse bidder for the sale of the Purchased Assets free and clear of all liens, claims and encumbrances.

13. The Debtor has determined that the floor established by the APA, subject to higher and better bids pursuant to a Court-approved, open auction process pursuant to section 363 of the Bankruptcy Code (the "Proposed Sale"), affords it the best opportunity to maximize value for its creditors.

14. Among other provisions, the APA includes the following salient terms:

   a. The closing shall take place on the date (the "Closing Date") that is the 3rd day after the Sale Order becomes a Final Order.

   b. The purchase price (the "Purchase Price") for the Purchased Assets will be $2,000,000, plus certain fees and costs to be paid by Purchaser as provided in the APA, plus assumption of the Assumed Liabilities, which Purchase Price includes a deposit of $200,000 (the "Deposit").

   c. Among other bid protections for the Purchaser, a break-up fee of $60,000 (the "Break-Up Fee") is payable to Purchaser if a competing bid is approved by the Court.

   d. The Debtor is obligated to obtain entry of the Sale Order, as a Final Order, on or before **July 19, 2011**.

A copy of the APA is attached as **Exhibit 4**. [1]

---

[1] While the Motion generally summarizes the APA, this summary is qualified, in its entirety, by the terms of the APA. To the extent there is a conflict between the terms of the APA and the description of those terms in the Motion, such conflict shall be resolved in favor of the APA and the terms of the APA shall be given full force and effect. Capitalized terms that are not defined in this Motion shall have the meaning set forth in the APA.

## THE BIDDING PROCEDURES

15.     The Debtor obviously desires to receive the greatest value for the Purchased Assets.  Although it believes that the APA is the result of exhaustive marketing efforts and is reasonable and reflects the highest and best value for the Purchased Assets as of the date of this Motion, the Debtor nevertheless recognizes the prudence of placing the APA to the test of the broader public marketplace in the bankruptcy case such that higher and better offers (a "<u>Superior Transaction</u>") might be generated for the Purchased Assets.  Accordingly, the Bidding Procedures were developed with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Purchased Assets.  At the same time, the Bidding Procedures reflect the Debtor's objective of conducting the Auction in a timely, controlled, and fair and open fashion that promotes interest in the Purchased Assets by financially-capable, motivated bidders who are likely to close a transaction.

16.     Accordingly, the Debtor requests that the Court approve the following bidding procedures (the "<u>Bidding Procedures</u>"):

## I.     <u>Participation Requirements</u>

Unless otherwise ordered by the Court for cause shown, to participate in the Bidding Process (as defined below), each person or entity (other than the Purchaser) must deliver (unless previously delivered) to the Debtor, on or before the Bid Deadline (as defined below), the following materials:

a.     An executed confidentiality agreement in form and substance satisfactory to the Debtor; and

b.     A written statement demonstrating to the Debtor's satisfaction a bona fide interest in purchasing, and the financial ability to purchase, the Purchased Assets.

Each person or entity that delivers such materials to the Debtor on or before the Bid Deadline (as defined below) in a form reasonably acceptable to the Debtor is hereinafter referred to as a "Potential Bidder." The Purchaser shall be deemed a Potential Bidder for all purposes and requirements of the Bidding Procedures.

After a Potential Bidder delivers all of the materials required by subparagraphs (a) and (b) above, the Debtor shall deliver (unless previously delivered) to each Potential Bidder certain designated information and financial data in respect of the Purchased Assets.

## II.    Determination by the Debtor

The Debtor shall (a) coordinate the efforts of any Potential Bidder in conducting its respective due diligence, (b) evaluate bids from Potential Bidders, (c) negotiate any bid made to purchase the Purchased Assets, and (d) make such other determinations as are provided in these Bidding Procedures (collectively, the "Bidding Process"). Neither the Debtor nor its representatives shall be obligated to furnish any information of any kind whatsoever relating to the Debtor to any person or entity that is not a Potential Bidder.

## III.    Due Diligence

The Debtor shall afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder which the Debtor, in its business judgment, determines to be reasonable and appropriate; provided, however, that if such additional information has not previously been provided to the Purchaser, the Debtor shall distribute such information to the Purchaser as and when provided to the Potential Bidder.

## IV.    Bid Deadline

A Potential Bidder (other than the Purchaser) that desires to make a bid shall deliver copies of its bid by email to (i) Debtor, Biofuel Industries Group, LLC, 30600 Northwestern Hwy – Suite 400, Farmington Hills, Michigan, 48334 (Attn: Terry J. Nosan) Email:  tnosan@nosan.net; (ii) Carson Fischer, P.L.C., 4111 Andover, West – Second Floor, Bloomfield Hills, Michigan, 48302 (Attn: Robert A. Weisberg) Email: RWeisberg@CarsonFischer.com; and (iii) Dickinson Wright, PLLC, 500 Woodward Ave., Suite 4000, Detroit, MI  48226 (Attn: Steven G. Howell, Esq. & Allison Bach, Esq.) Email: SHowell@DickinsonWright.com & ABach@DickinsonWright.com, by no later than **[June 17, 2011]** at 4:00 p.m. (the "Bid Deadline").

## V.    Bid Requirements

All bids (other than the APA) must include:

a.  an offer to acquire the Purchased Assets in the form of the APA, marked to show any proposed amendments and modifications to such agreement (the "Marked Agreement");

b.  an agreement that the Potential Bidder's offer is binding and irrevocable until the entry of the Sale Order; and

c.  a proposed purchase price greater than the aggregate consideration offered by the Purchaser pursuant to the APA, such that the initial competing bid (the "Initial Bid Increment") must be in the amount of at least the Purchase Price, plus the Break-Up Fee ($60,000), plus $100,000, plus any outstanding and anticipated Advances (as defined in the APA) under the DIP Loan (also as defined in the APA).

Bids must be (a) cash only bids (including, if part of the bid, the assumption of liabilities of the Debtor) and (b) accompanied by (a) a certified check or wire transfer in an amount equal to $200,000 payable to the order of the Debtor (a "Good Faith Deposit") and (b) written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder and such other evidence of ability to consummate the transaction as the Debtor may reasonably request.

The Debtor will review each bid received from a Potential Bidder to ensure that it meets the requirements set forth above. A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." The Debtor will determine whether each bid meets the requirements of a Qualified Bid. The APA is a Qualified Bid and the Purchaser is a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures.

The Debtor may value a Qualified Bid based upon any and all factors that the Debtor deems pertinent, including, among others: (a) the amount of the Qualified Bid; (b) the risks and timing associated with consummating a transaction with the Potential Bidder; (c) any assets or executory contracts and leases proposed to be assumed; and (d) any other factors that the Debtor may deem relevant to the sale. The Debtor, in its business judgment, reserves the right to reject any bid (other than the APA) if the bid: (a) is on terms that are more burdensome or conditional than the terms of the APA; (b) requires any indemnification of such Potential Bidder in its Marked Agreement; (c) is not received by the Bid Deadline; (d) includes non-cash consideration other than assumption of liabilities; or (e) is subject to any due diligence, financing condition or

other contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to purchase the Purchased Assets (other than as may be included in the APA).

Any bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.

## VI.  Auction Participation

Only the Purchaser and Qualified Bidders are eligible to participate at the Auction.  Promptly after expiration of the Bid Deadline, the Debtor will inform in writing each Potential Bidder of the identity of all Qualified Bidders that may participate in the Auction. If the Debtor does not receive any Qualified Bids other than the APA, it will not hold an Auction, the APA will be the Successful Bid (as defined below) and the Buyer will be named the Successful Bidder (as defined below).

## VII.  Auction

If the Debtor receives a Qualified Bid from a bidder other than the Purchaser, the Debtor will conduct the Auction. The Auction shall take place at **[10:00 a.m. (Eastern Time) on June 22, 2011]**, at the offices of counsel to the Debtor, Carson Fischer, P.L.C., 4111 Andover, West – Second Floor, Bloomfield Hills, Michigan, 48302, or such other time or such other place as the Debtor shall designate in a subsequent notice to all Qualified Bidders.

Representatives of the Committee, Office of the United States Trustee and Citizens, and any other parties the Debtor deems appropriate shall be able to attend and observe the Auction.  The Auction will be conducted openly and may be transcribed or videotaped, at the Debtor's option. All bids must be cash only bids (including, if part of the bid, the assumption of liabilities of the Debtor). The bidding shall start at the amount offered in the highest Qualified Bid, plus $25,000 and will continue in increments of at least $25,000 until the bidding ceases. All bids at the Auction will be made public to each bidder as such bids are made.

Immediately prior to the conclusion of the Auction, the Debtor will: (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale; (b) determine the highest or best bid for the Assets at the Auction (the "Successful Bid"); and (c) notify all Potential Bidders at the Auction, prior to its conclusion, of the name of the person or entity making the Successful Bid (the "Successful Bidder").

After determining the Successful Bid, the Debtor may determine, in its reasonable business judgment, which Qualified Bid is the next best bid (the "Next Best Bid").

All bidders at the Auction shall be deemed to have consented to the Bidding Procedures and the core jurisdiction of the Court and to have waived any right to jury trial in connection with any disputes relating to the Auction, the Proposed Sale of the assets and the construction and enforcement of the APA.

## VIII. Acceptance of Qualified Bids

Notwithstanding anything to the contrary contained herein, the Debtor may reject at any time before entry of the Sale Order any bid, other than the APA, that, in the Debtor's reasonable judgment, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Proposed Sale or (c) contrary to the best interests of the Debtor and its estate.

The Debtor's presentation to this Court for approval of the selected bid as the Successful Bid does not constitute the Debtor's acceptance of the bid. The Debtor will have accepted a Qualified Bid only when such Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

If the Successful Bidder does not close the Proposed Sale by the date agreed to by the Debtor and the Successful Bidder, then the Debtor shall be authorized, but not required, to close with the party that submitted the Next Best Bid (the "Next Best Bidder"), without further court order.

## IX. No Fees for Potential Bidders or Qualified Bidders

Except for the Break-Up Fee for the Purchaser contemplated by the APA, Potential Bidders or Qualified Bidders will not be allowed any breakup, termination or similar fee or expense reimbursement. Moreover, neither the tendering of a bid nor the determination that a bid is a Qualified Bid will entitle a Potential Bidder or Qualified Bidder to any breakup, termination or similar fee or expense reimbursement and all Potential Bidders and Qualified Bidders, other than the Purchaser for the Break-Up Fee as contemplated by the APA, waive any right to seek a claim for substantial contribution.

## X. Return of Good Faith Deposit

The Good Faith Deposits of all Potential Bidders shall be held in escrow by the Debtor, and shall not become property of the Debtor's estate. Except as provided herein,

the Good Faith Deposit of each Potential Bidder shall be returned to such Potential Bidder upon entry of the Sale Order. The Deposit of the Purchaser shall be returned to the Purchaser in accordance with the terms of the APA.

17.     The Debtor believes that the foregoing Bidding Procedures provide an appropriate framework for selling the Purchased Assets and will enable the Debtor to review, analyze and compare all Bids received to determine which Bid is in the best interests of the Debtor's estate and creditors.

## PROPOSED BIDDING PROTECTIONS

18.     As part of the Bidding Procedures Order, the Debtor is also requesting approval of the provisions of the APA regarding the payment of the Break-Up Fee on the terms and conditions set forth in the APA. The Purchaser has indicated that it is not willing to serve as a stalking horse bidder without the inclusion and pre-approval of the Break-Up Fee.

19.     As contained in greater detail in the APA, if approved by this Court, the Debtor would be required to pay the Purchaser the Break-Up Fee if a competing bid is approved by an order of the Bankruptcy Court.

20.     Approval of bid protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code is an established practice in chapter 11 cases. Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," which proscribes judicial second-guessing of the actions of a company taken in good faith and in the exercise of honest judgment. See, e.g., In re Loral Space & Commc'ns Ltd., Case No. 03-41710 (RDD)

(Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); <u>In re</u>
<u>Magellan Health Servs., Inc.</u>, Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. 2003)
(approving termination fee, commitment fee, and reimbursement of expenses); <u>In re</u>
<u>Integrated Res., Inc.</u>, 147 B.R. 650, 662 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d
Cir. 1993) (approving termination fee plus reimbursement of expenses); <u>In re Marrose</u>
<u>Corp.</u>, Case Nos. 89 B 12171 (CB) to 89 B 12179 (CB), 1992 WL 33848 at *5 (Bankr.
S.D.N.Y. Feb. 15, 1992) (bidding incentives are "meant to compensate the potential
acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable
offers."); <u>In re 995 Fifth Ave. Assocs., L.P.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding
incentives may be "legitimately necessary to convince a white knight to enter the
bidding by providing some form of compensation for the risks it is undertaking.")
(citation omitted).

21.     The Debtor submits that the proposed Break-Up Fee will not chill bidding,
is reasonable, and will enable the Debtor to maximize the value of its estate.

22.     The APA establishes a legitimate price floor and initiates a legitimate sales
process, allowing the Debtor to both maximize the value of its estate and evaluate
properly other competing bids that may be materially higher or otherwise better than
the Purchaser's bid reflected in the APA.

## PROPOSED SALE PROCESS NOTICE

23.     Pursuant to Bankruptcy Rule 2002(a), absent an order of the Court, the
Debtor is required to provide its creditors with 21 days' notice of the Sale Hearing.
Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time, and place

of the Auction and the Sale Hearing, and the deadline for filing any objections to the Proposed Sale. The Debtor proposes that the deadline for objecting to approval of the Proposed Sale shall be the Objection Deadline provided in the Bidding Procedures Order. Within two (2) business days of entry of the Bidding Procedures Order, the Debtor will cause the Sale Process Notice, in a form substantially similar to the form attached hereto as **Exhibit 5**, and the Bidding Procedures Order, to be sent by first class mail, postage-prepaid, to (i) all entities that claim any interest in or lien on the Purchased Assets; (ii) the Debtor's twenty largest unsecured creditors, as identified in the Debtor's chapter 11 petition, (iii) all entities that have requested service in this chapter 11 case; (iv) all governmental taxing authorities that have, or as a result of the sale of the Purchased Assets may have, claims, contingent or otherwise, against the Debtor; (v) all creditors (whether liquidated, contingent or unmatured) of the Debtor; (vi) all interested governmental, pension, and environmental entities; (vii) the Office of the United States Trustee; and (viii) all entities that have, within the past 12 month period, expressed to the Debtor an interest in purchasing the Purchased Assets.

24. The Sale Process Notice shall indicate that this Motion and the APA can be obtained from counsel for the Debtor. In addition, the Debtor has served this Motion, including a copy of the APA, on those persons in categories (i) through (viii), above.

25. The Sale Process Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the proposed deadline for filing any objections to the Proposed Sale, and, will therefore, comply with Bankruptcy Rule 2002(c). The Debtor submits that the methods of notice described herein comply with

Bankruptcy Rule 2002 and constitute good and adequate notice of the Proposed Sale of the Purchased Assets. Therefore, the Debtor respectfully requests that this Court approve the notice procedures proposed above.

## EXECUTORY CONTRACTS AND LEASES

26.     Purchaser has indicated that it does not intend to assume any executory contracts or unexpired leases at this time. However, if Purchaser later decides to assume any contracts or leases pursuant to section 365 of the Bankruptcy Code, the Debtor will file an appropriate motion and give as much notice as possible to counterparties to those contracts and leases proposed to be assumed and assigned.

## BASIS FOR RELIEF

**A.     The Bidding Procedures Are Appropriate And Will Maximize The Value Received For The Purchased Assets.**

27.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bidding Procedures will greatly assist the Debtor in maximizing the value that it may obtain for the Purchased Assets. Consequently, the Debtor respectfully submits that granting the requested relief is "appropriate" under the circumstance.

28.     Once the Debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re S.N.A. Nut Company, 186 B.R. 98

(Bankr. N.D. Ill. 1995)(internal quotation, citation omitted); <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992); <u>In re Johns-Manville Corp.</u>, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

29.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. <u>See</u> <u>Summit Land Co. v. Allen (In re Summit Land Co.)</u>, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefor. <u>See</u> <u>Schipper</u>, 933 F.2d at 515; <u>In re Lionel Com.</u>, 722 F.2d at 1071; <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169 at 179.

30.     The Bidding Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtor's estate for its creditors. The proposed procedures contain terms typical for a process through which a sale of this nature is consummated, and the adoption of the Bidding Procedures represents a sound exercise of the Debtor's business judgment.

31.     The Debtor believes it is in the best interests of its estate and creditors to commence an auction process immediately, as the Debtor has very limited funding and resources, to try to maximize the value of its assets for all stakeholders.

32.     For these reasons, the Debtor has determined, based upon its business judgment, that the best option for maximizing the value of its estate for the benefit of its creditors and other parties in interest is through a sale of the Purchased Assets pursuant to the Bidding Procedures.

33. The Bidding Procedures are designed to encourage competitive bidding. The Purchaser's bid will serve as a floor for other bids and will induce other bids that otherwise would not have been made. As such, the Bidding Procedures will provide a benefit to the Debtor's estate.

34. The minimum overbid requirements described in the Bidding Procedures are appropriate under the circumstances as well. They are rather modest minimum overbid requirements given the size of this transaction, and the Debtor believes that it is unlikely that they will deter a serious competing bidder.

35. Accordingly, the Debtor requests that the Court approve the Bidding Procedures.

**B. The APA And Proposed Sale Have A Sound Business Justification, Were And Will Be Arm's-Length Transactions, And Will Maximize The Return For Creditors.**

36. The relief requested by this Motion is appropriate and within the Court's authority to approve transactions under section 363(b) of the Bankruptcy Code and within the Court's equitable powers under section 105(a) of the Bankruptcy Code.

37. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the disposition of a debtor's assets prior to confirmation of a plan. However, bankruptcy courts have required that the decision to sell assets outside the ordinary course of business be based upon the sound business

judgment of the debtors. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

38.     A court has the statutory authority to authorize a debtor to use property of the estate pursuant to section 363(b)(1) of the Code when such use is in the debtor's sound business judgment and when the use of the property is proposed in good faith. See Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (utilizing the "sound business purpose" standard for sales proposed under section 363(b)(1)); see also In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983).

39.     In addition, the relief requested by this Motion is appropriate and within the Court's equitable powers under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a).

40.     Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. See In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993);

<u>Pincus v. Graduate Loan Ctr. (In re Pincus)</u>, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).

Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or

protect the value of a debtor's assets. <u>See, e.g.</u>, <u>Chinichian v. Campolongo (In re</u>

<u>Chinichian)</u>, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the

bankruptcy court to fashion orders as necessary pursuant to the purposes of the

Bankruptcy Code."); <u>In re Cooper Props. Liq. Trust, Inc.</u>, 61 B.R. 531, 537 (Bankr. W.D.

Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to

protect whatever equities a debtor may have in property for the benefit of its creditors

as long as that protection is implemented in a manner consistent with the bankruptcy

laws").

41.     A debtor's showing of a sound business purpose need not be unduly

exhaustive but, rather, a debtor is "simply required to justify the proposed disposition

with sound business reasons." <u>In re Baldwin United Corp.</u>, 43 B.R. 888, 906 (Bankr. S.D.

Ohio 1984).

42.     Whether or not there are sufficient business reasons to justify a transaction

depends upon the facts and circumstances of each case. <u>Lionel</u>, 722 F.2d at 1071; <u>see also</u>

<u>Montgomery Ward</u>, 242 B.R. at 155.

43.     The Debtor submits that ample business justification exists to sell the

Purchased Assets to the Purchaser or any other Successful Bidder pursuant to the terms

of the Bidding Procedures Order.  The Debtor has carefully considered and analyzed

the Purchaser's offer as set forth in the APA, and in light of the circumstances described

herein, has concluded that a sale of the Purchased Assets is in the best interests of the

estate and will maximize the value of the Debtor's estate for the benefit of all stakeholders. Thus a sound business purpose justifies the sale of the Purchased Assets. The Debtor has no cash to fund its operations and believes that a prompt sale at the outset of the bankruptcy case is vital to preserving any potential "going concern" value of the Debtor's business and to maximize recovery to creditors and other parties in interest. Thus, the Proposed Sale presents the best opportunity to realize value for the Debtor's creditors. As described above, the Debtor has already extensively marketed the Purchased Assets to potential bidders, and there will be sufficient time and opportunity for potential qualified bidders to submit overbids. The Debtor, in the exercise of its business judgment, and in consultation with its professionals, believes that the Proposed Sale to the Purchaser, or any other Successful Bidder, will constitute the highest and best offer for the Purchased Assets.

44.     The sale of the Purchased Assets will be in exchange for fair and reasonable value. Pursuant to the APA, the Purchaser has agreed to provide the previously described consideration for the Purchased Assets. The Debtor submits that this constitutes significant consideration for the Purchased Assets, and the Proposed Sale is further subject to an open market process through the solicitation of competing bids in the Court-supervised Auction. Pursuant to the Bidding Procedures Order, all potentially interested bidders will receive adequate and reasonable notice of the opportunity to submit a competing bid prior to the Auction, and the Bidding Procedures will facilitate an open and competitive bidding process in which all parties will participate in good faith.

45.     Moreover, the APA was the product of good faith, arm's length negotiations between the Debtor, on the one hand, and the Purchaser, on the other, and was negotiated with the active involvement of the Debtor's representatives.   The Purchaser is a limited liability company that is not related to the Debtor in any way; provided, however, it is presently contemplated that the Purchaser may contract with another certain limited liability company that is intended to provide consulting services to the Purchaser ("Consulting LLC").  Consulting LLC is, or will be, owned, in whole or in part, by one or more of Terry J. Nosan, Bradley J. Schram, and/or Michael P. Horowitz, or entities owned directly or indirectly by them.  Messrs. Nosan, Schram and Horowitz indirectly own interests in the Debtor, including indirect ownership and control of the sole voting member of the Debtor.

46.     The Debtor believes and submits that the Proposed Sale of the Purchased Assets to the Purchaser pursuant to the APA is not the product of collusion or bad faith. The Purchaser does not share common ownership with the Debtor, and is independently controlled and operated.  For these reasons, the Proposed Sale satisfies the good faith element of the "sound business purpose" test. See Abbotts Dairies, 788 F.2d at 147-48 ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.").

**C.     The Proposed Sale Satisfies The Requirements Of Section 363(f) Of The Bankruptcy Code**

47.     The Debtor further submits that it is appropriate to sell the Purchased Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the proceeds of the Proposed Sale of the Purchased Assets to the extent applicable.

48.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. <u>See</u> 11 U.S.C. § 363(f); <u>Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  The Debtor expects that it will satisfy the requirements of section 363(f) of the Bankruptcy Code.

49.     Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). <u>See, e.g.</u>, <u>In re Trans World Airlines, Inc.</u>, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001) (explaining that "courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of §363(f)"); <u>Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948

(Bankr. N.D. Ohio 1987) (authorizing sale free and clear of tort claims even if such claims are not covered specifically by the provisions of §363(f)).  As the Trans World Airlines court explained, "[t]he authority to sell free and clear is broad. It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property." Trans World, 2001 WL 1820325, at *3.  Thus, even in the case of general unsecured claimants, including tort claimants, who arguably have no specific interest in a debtor's property (and, therefore, section 363 of the Bankruptcy Code would not be applicable to such claims), courts have held that the authority to conduct sales free and clear of such claims is still within their equitable powers.  White Motor Credit., 75 B.R. at 948.

50.    A sale of the Purchased Assets other than one free and clear of encumbrances would have a material adverse impact on the Debtor's bankruptcy estate and would yield substantially less value for the Debtor's estate with less certainty than the Proposed Sale.  The Purchaser would not have entered into the APA if the purchase of the Purchased Assets would not be free and clear of encumbrances. The Debtor believes that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Purchased Assets pursuant to the APA. Moreover, the Debtor believes that at least section 363(f)(2) will be met in connection with the transactions proposed under the APA because each of the parties holding liens on the Purchased Assets will consent, or, absent any objection to this Motion, will be deemed to have consented to the Proposed Sale. Additionally, any lienholder will be adequately protected by having their liens, if any, attach to the proceeds of the Proposed Sale in the same order of

priority, with the same validity, force and effect that such creditor had prior to the Proposed Sale, subject to any claims and defenses the Debtor may possess with respect thereto. Therefore, the Proposed Sale should be approved free and clear of encumbrances, as being in the best interests of the Debtor, its estate and creditors, and all other parties in interest.

**D.    The Sale Of The Purchased Assets Is Proposed In "Good Faith" Under Section 363(m) Of The Bankruptcy Code.**

51.    The Debtor additionally requests that the Court find that the Purchaser or any other Successful Bidder, as the case may be, is entitled to the protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale. Section 363(m) of the Bankruptcy Code provides, in pertinent part: "The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal." 11 U.S.C. § 363(m).

52.    Section 363(m) thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

53.    Although the Bankruptcy Code does not define "good faith purchaser," courts have found that "the phrase encompasses one who purchases in 'good faith' and for 'value'." In re Abbotts Dairies of Penn, Inc., 788 F.2d 173, 147 (3d Cir. 1986)). To

constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)); see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus. Machinery Corp., 572 F.2d at 1198 (7th Cir. 1978)).

54.     As required by section 363(m) of the Bankruptcy Code, both the Debtor and the Purchaser have acted in good faith in negotiating the sale of the Purchased Assets.  There is no evidence of fraud or collusion in the terms of the Proposed Sale.  To the contrary, as discussed throughout this Motion, the Proposed Sale will be the culmination of a lengthy solicitation and negotiation process.  The Purchaser is not, nor would any other Successful Bidder be, an insider of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms-length, good faith basis.  The Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  Furthermore, the Bidding Procedures are designed to prevent the Debtor, the Purchaser or any other Successful Bidder from engaging in any conduct that would cause or

permit the Proposed Sale to be avoided, or costs or damages to be imposed under, section 363(n) of the Bankruptcy Code.

55.     All creditors and parties in interest will receive notice of the Proposed Sale and will be provided an opportunity to be heard.  The Debtor submits that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under section 363(b) of the Bankruptcy Code. Under the circumstances, the Purchaser or any other Successful Bidder, as the case may be, should be afforded the benefits and protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

**E.     Relief From The Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h) And 6006(d) Is Appropriate.**

56.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

57.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although

Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier on Bankruptcy provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

58. The Debtor hereby requests that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

59. All creditors and parties in interest will receive notice of the Proposed Sale or a competing transaction and will be provided with an opportunity to be heard. The Debtor submits that such notice is adequate for entry of the order approving this Motion and waiving the fourteen (14) day waiting periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

60. Notice of this Motion has been provided to: (i) the Office of the United States Trustee, (ii) counsel for Debtor's prepetition and postpetition secured lenders, (iii) those parties included on the proposed *Motion for Order Establishing Limited Notice Pursuant to Federal Rules of Bankruptcy Procedure 2002(I) and (M) and 11 U.S.C. §§ 105(A) and 1102*; and (iv) the 20 largest unsecured creditors of Debtor. Additional notice will

be provided consistent with paragraphs 23 and 24 above. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtor respectfully submits that no further notice of this Motion is required. In order to comply with the requirements of the APA, this Sale Motion has been submitted on an expedited basis.

WHEREFORE, the Debtor respectfully requests the Court grant the relief requested in this Sale Motion substantially in the form attached as **Exhibit 1-A** and **Exhibit 1-B**, and such other and further relief as is just and proper

**CARSON FISCHER, P.L.C.**

*/s/ Christopher A. Grosman*
Robert A. Weisberg (P26698)
Christopher A. Grosman (P58693)
4111 Andover Road
West - Second Floor
Bloomfield Hills, Michigan 48302
Telephone: (248) 644-4840
Facsimile: (248) 644-1832
E-mail: RWeisberg@CarsonFicher.com
         CGrosman@CarsonFischer.com

Dated: May 23, 2011     *Proposed Counsel for the Debtor and Debtor In Possession*

**Exhibit 1-A**

**(Proposed Bidding Procedures Order)**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---------------------------------------------------------------- x
In re:                                          )
                                                )    Chapter 11
**BIOFUEL INDUSTRIES GROUP, LLC,**              )    Case No. 11-_____
                                                )    Hon. _____
                          Debtor.               )
---------------------------------------------------------------- x

**ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING CERTAIN
BIDDING PROTECTIONS, (C) APPROVING THE FORM AND MANNER OF
NOTICE OF THE BIDDING PROCEDURES HEARING, THE AUCTION AND SALE
HEARING, AND (D) SCHEDULING AN AUCTION AND SALE HEARING**

This matter having come before the Court upon the Motion [Docket No. _____]

(the "Sale Motion")[1] of Biofuel Industries Group, LLC**,** debtor and debtor-in-possession

herein (the "Debtor"), seeking, pursuant to sections 105, 363, and 503 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), an order (i)

authorizing and approving the procedures that are contained in Paragraph 22 below

(the "Bidding Procedures") for the sale (the "Proposed Sale") of substantially all of the

Debtor's assets (the "Purchased Assets"), (ii) approving certain bidding protections, (iii)

approving the form and manner of notice of the Bidding Procedures Hearing, the

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to them in the
Sale Motion, the APA (as defined hereafter), or the Bankruptcy Code, as applicable. A copy of the form
of the APA is attached to the Sale Motion.

Auction and the Sale Hearing (as such capitalized terms are each defined below) (the "Sale Process Notice"), and (iv) scheduling an auction (the "Auction") and a final sale hearing (the "Sale Hearing") in connection with the Proposed Sale; the Court having reviewed the Sale Motion and conducted a hearing to consider the relief requested therein (the "Bidding Procedures Hearing"); and the Court having considered the statements of counsel and the evidence presented at the Bidding Procedures Hearing.

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over this matter and over the property of the Debtor and its bankruptcy estate pursuant to 28 U.S.C. §§ 157(a) and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O). The statutory predicates for relief are 11 U.S.C. §§ 105, 363, 364 and 503 and Fed. R. Bankr. P. 2002, 6004, 9007 and 9014. Venue of this case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The Debtor has offered good and sufficient reasons for, and the best interests of its estate will be served by, this Court granting the Sale Motion to the extent provided in this Order, including approval of (i) the Bidding Procedures, and (ii) the form and manner of notice of the Sale Process Notice described in the Sale Motion and this Order.

C.    The proposed notice of the Proposed Sale and the Bidding Procedures, as set forth in the Sale Motion and this Order, including the Sale Process Notice, is

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* Fed. R. Bankr. P. 7052.

appropriate and sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the matters described therein, and no other or further notice shall be required for the Bidding Procedures, the Auction, the Proposed Sale or the Sale Hearing.

D.     The Debtor has offered good and sufficient reasons for, and the best interests of its estate will be served by, this Court scheduling an Auction and subsequent Sale Hearing to consider approval of the Proposed Sale free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

E.     The Debtor has articulated good and sufficient reasons for the Court to (i) approve the Bidding Procedures, (ii) approve the Break-Up Fee (for the reasons set forth below) as provided in the Asset Purchase Agreement substantially in the form annexed to the Motion at **Exhibit 4** ("APA"), (iii) approve the form and manner of notice of the Bidding Procedures, the Auction and the Sale Hearing and (iv) schedule the date of the Auction and Sale Hearing.

F.     The Break-Up Fee (as such term is defined in the APA) to be paid to LQM Ventures LLC, for itself or on behalf of an affiliate to be formed (the "Purchaser") under the circumstances described herein and in the APA: (i) is an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code; (ii) is commensurate with the real and substantial benefits conferred upon the Debtor's estate by the Purchaser; (iii) is reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions; (iv) has

3

been negotiated by the parties and their respective counsel at arms' length and in good faith, and (v) is necessary to induce the Purchaser to proceed with the Sale. The Break-Up Fee is a material inducement for, and a condition of, the Purchaser entering into the APA and making the Stalking Horse Bid (defined below). The Purchaser has expended substantial time and expenses in connection with negotiating and entering into the APA, and conducting due diligence in connection therewith, and is unwilling to commit to buy the Purchased Assets under the terms set forth in the APA unless the Purchaser is assured the Break-Up Fee.

G.      The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Purchased Assets.

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Bidding Procedures, substantially in the form contained in Paragraph 22 below, are hereby approved, are incorporated herein by reference, and shall govern all bids and bid proceedings relating to the Proposed Sale. The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      The Sale contemplated by the APA is designated as the "Stalking Horse Bid."

4.      The Debtor is authorized and directed to pay to the Purchaser in accordance with the APA, without further order of the Court, the Break-Up Fee in the event that such Break-Up Fee is payable under the terms of the APA. The Break-Up Fee shall constitute a first priority administrative claim in the Debtor's Bankruptcy Case

pursuant to Bankruptcy Code §503(b) and be paid to Purchaser as an administrative expense upon the closing of any competing bid.

5.      The deadline for submitting a Qualified Bid shall be **[June 17, 2011]** at 4:00 p.m. Eastern Time (the "Bid Deadline").  To constitute a "Qualified Bid," a bid (other than the Stalking Horse Bid) must be received by the Bid Deadline and otherwise comply with all the applicable provisions of the Bidding Procedures.

6.      The APA is a Qualified Bid (as defined in Paragraph 22 below) and the Purchaser is a Qualified Bidder (as defined in Paragraph 22 below), for all purposes and requirements pursuant to the Bidding Procedures.

7.      All bidders submitting a Qualified Bid prior to the Bid Deadline are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Purchased Assets.

8.      If the Debtor does not receive any Qualified Bids prior to the Bid Deadline other than the APA, it will not hold an Auction, the APA will be the Successful Bid and the Purchaser shall be named the Successful Bidder (as defined in Paragraph 22 below).

9.      If the Debtor receives a Qualified Bid prior to the Bid Deadline from a bidder other than the Purchaser, the Debtor shall conduct the Auction at 10:00 a.m. (Eastern Time) on **[June 22, 2011]** at the offices of Carson Fischer, P.L.C., 4111 Andover, West – Second Floor, Bloomfield Hills, MI, 48302, or such other place and time as the Debtor shall notify the Qualified Bidders, the Committee (as defined in Paragraph 22

below) and such other parties as the Debtor deems appropriate consistent with the Sale Motion.

10.     Each Qualified Bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion in respect to the bidding or the Proposed Sale.

11.     The Auction shall be conducted openly and may be transcribed or videotaped, at the Debtor's option.

12.     The Court shall convene the Sale Hearing on **[June 23/24, 2011] at ____ _.m.** Eastern Time or as soon thereafter as counsel and interested parties may be heard, at which time the Court shall consider approval of the Proposed Sale to the Successful Bidder.  The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest by announcement of said adjournment at the Sale Hearing.

13.     Objections to approval of the Proposed Sale, including the sale of the Purchased Assets free and clear of liens, claims, encumbrances and interests pursuant to section 363(f) of the Bankruptcy Code, must be in writing, state the basis of such objection with specificity and be filed with this Court and served so as to be received on or before 4:00 p.m. (Eastern Time) on **[June 17, 2011]** (the "Objection Deadline") by the following parties: (i) counsel to the Debtor: Carson Fischer, P.L.C., 4111 Andover, West – 2nd Floor, Bloomfield Hills, Michigan, 48302 (Attn: Robert A. Weisberg, Esq. and Christopher A. Grosman, Esq.); (ii) counsel to the Official Committee of Unsecured Creditors: ___ (Attn: ___); (iii) counsel to the proposed Purchaser: Crowell & Moring

6

LLP, 590 Madison Avenue, 20th Floor, New York, NY 10022-2524, (Attn: Michael V. Blumenthal, Esq.); and (iv) the United States Trustee: The Office of the United States Trustee, 211 West Fort Street - Suite 700, Detroit, MI 48226, (Attn: ___, Esq.) (collectively, the "Notice Parties").

14.     The failure to file and serve an objection to the Proposed Sale by the Objection Deadline shall be a bar to the assertion thereof at the Sale Hearing or thereafter.

15.     The Sale Process Notice in the form attached to the Sale Motion is appropriate and sufficient for all purposes and no other or further notice shall be required if the Debtor serves such notice in the manner provided in the Sale Motion and this Order.

16.     No finding or ruling is made in this Order as to the merits of any motion for approval of the Proposed Sale.

17.     All bidders at the Auction shall be deemed to have consented to the core jurisdiction of this Court and waived any right to jury trial in connection with any disputes relating to the Auction and the Sale.

18.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

19.     The Debtor's obligation to pay the Break-Up Fee as provided herein and in the APA shall (i) survive termination of the Stalking Horse Bid, (ii) constitute a superpriority administrative claim against the Debtor's estate pursuant to sections 105(a), 503(b) and 364(c)(1) of the Bankruptcy Code, and (iii) be senior to, and have

priority over, all other claims against the Debtor, but excluding and subject and subordinate only to existing and properly perfected security interests in the Collateral as of the filing of the Bankruptcy Case. Subject to the foregoing, the Break-Up Fee shall be paid in cash from the proceeds of any sale of the Purchased Assets at the closing of a sale to a Qualified Bidder other than the Purchaser.

20. The Debtor is authorized to take any and all actions as contemplated by the Stalking Horse Bid prior to the Auction and Sale Hearing, without limitation, actions to notify creditors or other interested parties regarding the Proposed Sale.

21. By the entry of this Order, the liens and security interests granted to Purchaser for Advances made under the DIP Loan that are referred to in the APA shall (i) be deemed valid and perfected, (ii) continue in full force and effect until the Advances and accrued interest thereon have been indefeasibly paid in full or the transactions contemplated the by APA have been consummated with the Purchaser, and (iii) be subordinate only to existing and properly perfected security interests in the Collateral as of the filing of the Bankruptcy Case.

22. The Bidding Procedures:

## I.     Participation Requirements

Unless otherwise ordered by the Court for cause shown, to participate in the Bidding Process (as defined below), each person or entity (other than the Purchaser) must deliver (unless previously delivered) to the Debtor, on or before the Bid Deadline (as defined below), the following materials:

a.    An executed confidentiality agreement in form and substance satisfactory to the Debtor; and

b.      A written statement demonstrating to the Debtor's satisfaction a bona fide interest in purchasing, and the financial ability to purchase, the Purchased Assets.

Each person or entity that delivers such materials to the Debtor on or before the Bid Deadline (as defined below) in a form reasonably acceptable to the Debtor is hereinafter referred to as a "Potential Bidder." The Purchaser shall be deemed a Potential Bidder for all purposes and requirements of the Bidding Procedures.

After a Potential Bidder delivers all of the materials required by subparagraphs (a) and (b) above, the Debtor shall deliver (unless previously delivered) to each Potential Bidder certain designated information and financial data in respect of the Purchased Assets.

## II.      Determination by the Debtor

The Debtor shall (a) coordinate the efforts of any Potential Bidder in conducting its respective due diligence, (b) evaluate bids from Potential Bidders, (c) negotiate any bid made to purchase the Purchased Assets, and (d) make such other determinations as are provided in these Bidding Procedures (collectively, the "Bidding Process"). Neither the Debtor nor its representatives shall be obligated to furnish any information of any kind whatsoever relating to the Debtor to any person or entity that is not a Potential Bidder.

## III.      Due Diligence

The Debtor shall afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder which the Debtor, in its business judgment, determines to be reasonable and appropriate; provided, however, that if such additional information has not previously been provided to the Purchaser, the Debtor shall distribute such information to the Purchaser as and when provided to the Potential Bidder.

## IV.      Bid Deadline

A Potential Bidder (other than the Purchaser) that desires to make a bid shall deliver copies of its bid by email to (i) Debtor, Biofuel Industries Group, LLC, 30600 Northwestern Hwy – Suite 400, Farmington Hills, Michigan, 48334 (Attn: Terry J. Nosan) Email: tnosan@nosan.net; (ii) Carson Fischer, P.L.C., 4111 Andover, West – Second Floor, Bloomfield Hills, Michigan, 48302 (Attn: Robert A. Weisberg) Email: RWeisberg@CarsonFischer.com; and (iii) Dickinson Wright, PLLC, 500 Woodward Ave., Suite 4000, Detroit, MI 48226 (Attn: Steven G. Howell, Esq. & Allison Bach, Esq.)

Email: SHowell@DickinsonWright.com & ABach@DickinsonWright.com, by no later than **[June 17, 2011]** at 4:00 p.m. (the "<u>Bid Deadline</u>").

## V.    <u>Bid Requirements</u>

All bids (other than the APA) must include:

a.    an offer to acquire the Purchased Assets in the form of the APA, marked to show any proposed amendments and modifications to such agreement (the "<u>Marked Agreement</u>");

b.    an agreement that the Potential Bidder's offer is binding and irrevocable until the entry of the Sale Order; and

c.    a proposed purchase price greater than the aggregate consideration offered by the Purchaser pursuant to the APA, such that the initial competing bid (the "<u>Initial Bid Increment</u>") must be in the amount of at least the Purchase Price, plus the Break-Up Fee ($60,000), plus $100,000, plus any outstanding and anticipated Advances (as defined in the APA) under the DIP Loan (also as defined in the APA).

Bids must be (a) cash only bids (including, if part of the bid, the assumption of liabilities of the Debtor) and (b) accompanied by (a) a certified check or wire transfer in an amount equal to $200,000 payable to the order of the Debtor (a "<u>Good Faith Deposit</u>") and (b) written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder and such other evidence of ability to consummate the transaction as the Debtor may reasonably request.

The Debtor will review each bid received from a Potential Bidder to ensure that it meets the requirements set forth above. A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." The Debtor will determine whether each bid meets the requirements of a Qualified Bid. The APA is a Qualified Bid and the Purchaser is a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures.

The Debtor may value a Qualified Bid based upon any and all factors that the Debtor deems pertinent, including, among others: (a) the amount of the Qualified Bid; (b) the risks and timing associated with consummating a transaction with the Potential Bidder; (c) any assets or executory contracts and leases proposed to be assumed; and (d) any other factors that the Debtor may deem relevant to the sale. The Debtor, in its business judgment, reserves the right to reject any bid (other than the APA) if the bid:

(a) is on terms that are more burdensome or conditional than the terms of the APA; (b) requires any indemnification of such Potential Bidder in its Marked Agreement; (c) is not received by the Bid Deadline; (d) includes non-cash consideration other than assumption of liabilities; or (e) is subject to any due diligence, financing condition or other contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to purchase the Purchased Assets (other than as may be included in the APA).

Any bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.

## VI.    Auction Participation

Only the Purchaser and Qualified Bidders are eligible to participate at the Auction.  Promptly after expiration of the Bid Deadline, the Debtor will inform in writing each Potential Bidder of the identity of all Qualified Bidders that may participate in the Auction. If the Debtor does not receive any Qualified Bids other than the APA, it will not hold an Auction, the APA will be the Successful Bid (as defined below) and the Buyer will be named the Successful Bidder (as defined below).

## VII.    Auction

If the Debtor receives a Qualified Bid from a bidder other than the Purchaser, the Debtor will conduct the Auction. The Auction shall take place at **[10:00 a.m. (Eastern Time) on June 22, 2011]**, at the offices of counsel to the Debtor, Carson Fischer, P.L.C., 4111 Andover, West – Second Floor, Bloomfield Hills, Michigan, 48302, or such other time or such other place as the Debtor shall designate in a subsequent notice to all Qualified Bidders.

Representatives of the Committee, Office of the United States Trustee and Citizens, and any other parties the Debtor deems appropriate shall be able to attend and observe the Auction.  The Auction will be conducted openly and may be transcribed or videotaped, at the Debtor's option. All bids must be cash only bids (including, if part of the bid, the assumption of liabilities of the Debtor). The bidding shall start at the amount offered in the highest Qualified Bid, plus $25,000 and will continue in increments of at least $25,000 until the bidding ceases. All bids at the Auction will be made public to each bidder as such bids are made.

Immediately prior to the conclusion of the Auction, the Debtor will: (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale; (b) determine the highest or best bid for the Assets at the Auction (the "Successful Bid"); and (c) notify all Potential Bidders at

the Auction, prior to its conclusion, of the name of the person or entity making the Successful Bid (the "Successful Bidder").

After determining the Successful Bid, the Debtor may determine, in its reasonable business judgment, which Qualified Bid is the next best bid (the "Next Best Bid").

All bidders at the Auction shall be deemed to have consented to the Bidding Procedures and the core jurisdiction of the Court and to have waived any right to jury trial in connection with any disputes relating to the Auction, the Proposed Sale of the assets and the construction and enforcement of the APA.

## VIII.    Acceptance of Qualified Bids

Notwithstanding anything to the contrary contained herein, the Debtor may reject at any time before entry of the Sale Order any bid, other than the APA, that, in the Debtor's reasonable judgment, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Proposed Sale or (c) contrary to the best interests of the Debtor and its estate.

The Debtor's presentation to this Court for approval of the selected bid as the Successful Bid does not constitute the Debtor's acceptance of the bid. The Debtor will have accepted a Qualified Bid only when such Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

If the Successful Bidder does not close the Proposed Sale by the date agreed to by the Debtor and the Successful Bidder, then the Debtor shall be authorized, but not required, to close with the party that submitted the Next Best Bid (the "Next Best Bidder"), without further court order.

## IX.    No Fees for Potential Bidders or Qualified Bidders

Except for the Break-Up Fee for the Purchaser contemplated by the APA, Potential Bidders or Qualified Bidders will not be allowed any breakup, termination or similar fee or expense reimbursement.  Moreover, neither the tendering of a bid nor the determination that a bid is a Qualified Bid will entitle a Potential Bidder or Qualified Bidder to any breakup, termination or similar fee or expense reimbursement and all Potential Bidders and Qualified Bidders, other than the Purchaser for the Break-Up Fee as contemplated by the APA, waive any right to seek a claim for substantial contribution.

## X.    Return of Good Faith Deposit

The Good Faith Deposits of all Potential Bidders shall be held in escrow by the Debtor, and shall not become property of the Debtor's estate. Except as provided herein, the Good Faith Deposit of each Potential Bidder shall be returned to such Potential Bidder upon entry of the Sale Order. The Deposit of the Purchaser shall be returned to the Purchaser in accordance with the terms of the APA.

**Exhibit 1-B**

(PROPOSED SALE APPROVAL ORDER)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
-------------------------------------------------------------- x
In re:                                       )
                                             )   Chapter 11
BIOFUEL INDUSTRIES GROUP, LLC,               )   Case No. 11-_____
                                             )   Hon. _____
            Debtor.                          )
-------------------------------------------------------------- x
```

**ORDER (I) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS
FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING
AND APPROVING ASSET PURCHASE AGREEMENT THERETO; AND (III)
GRANTING RELATED RELIEF**

Upon the motion dated May __, 2011 [Docket No. ___] (the "Sale Motion")[1] of

**BIOFUEL INDUSTRIES GROUP, LLC**, as debtor and debtor in possession (the "Debtor")

for entry of an order, pursuant to sections 105 and 363 of title 11 of the United States Code (the

"Bankruptcy Code"), and Rules 2002, 6004, 9007 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") authorizing and approving, among other things, the sale of

the Purchased Assets, free and clear of all liens, claims, encumbrances and other interests as

hereafter provided; the Debtor having provided notice and an opportunity for an auction (the

"Auction") of the Purchased Assets (as defined below); no party, other than the Purchaser (as

defined below), having bid for the Purchased Assets and thus no Auction having been held; the

Court having conducted a hearing on the Sale Motion (the "Sale Hearing") to consider the

approval of the sale of the Purchased Assets and related transactions (the "Sale") contemplated

pursuant to the Asset Purchase Agreement ("APA") between the Debtor and LQM Ventures

LLC (the "Purchaser"); objections that have been raised to the Sale Motion have been withdrawn

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the APA.

or otherwise resolved by the terms of this Order; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA and transactions contemplated thereby; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefore,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

**I.      Jurisdiction, Final Order and Statutory Predicates**

A.      The Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334(a), and over the entities which are subject to the terms of this Order, including, but not limited to all creditors, all persons and entities who have a claim (as defined in § 101(5) of the Bankruptcy Code) against the Debtor or its estates, and all parties in interest, including those entities claiming an interest in the Purchased Assets, as defined in the APA.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rule 6004(h), the Court expressly finds that there is no just reason for delay in the implementation of this order, and expressly directs entry of judgment as set forth herein.

C.      The statutory predicates for the relief requested in the Sale Motion are sections 105(a) and 363(b), (f), and (m), of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004, 9007 and 9014.

D        The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

E.        To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent herewith.

## II.        Notice of the Sale, Auction

A.        Actual written notice of the Sale Hearing, the Auction, the Sale Motion, the Sale, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all known interested persons and entities, including, but not limited to the following parties (the "Notice Parties"):

1.        the Office of the United States Trustee;

2.        counsel to the Debtors' prepetition secured lenders;

3.        all governmental taxing authorities that have, or as a result of the sale of the Purchased Assets may have, claims, contingent or otherwise, against the Debtor;

4.        the Debtor's twenty largest unsecured creditors, as identified in the Debtors' chapter 11 petition;

5.        all interested governmental, pension, and environmental entities;

6.        all parties that have requested notice pursuant to Bankruptcy Rule 2002;

7.        all persons or entities known to the Debtor that claim any interest in or lien on the Purchased Assets;

8.        counsel to the Purchaser; and

9.        all entities that have, within the past 12 months, expressed an interest in purchasing the Purchased Assets.

3

B.      As evidenced by the affidavits of service previously filed with the Court and based upon representation of counsel at the Sale Hearing, proper, timely, adequate, and sufficient notice of the Sale Motion and the Sale has been provided in accordance with sections 102(1), 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014.  The notices described above were good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, Sale Hearing or Sale is required.

C.      The disclosures made by the Debtor concerning the Sale Motion, APA, Sale, and Sale Hearing were good, complete and adequate.

## III.    Good Faith of Purchaser

A.      The Purchaser is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

B.      The Purchaser is purchasing the Purchased Assets in good faith and is a good faith Purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, inter alia: (a) Purchaser recognized that the Debtor was free to deal with any other party interested in acquiring the Purchased Assets; (b) Purchaser in no way induced or caused the chapter 11 filing by the Debtor; (c) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed, including potential employment agreements with certain principals of the Debtor; (d) Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction and has not acted in any improper or collusive manner with any person; (e) no common identity of directors or controlling stockholders exists between the Purchaser and any of the Debtor; and (f) the Purchaser and the

4

Debtor the negotiated and executed of the final APA (as may be amended pursuant to this order), which is attached hereto as Exhibit A, without collusion, in good faith, and from arm's length bargaining position.

C.     The terms and conditions of the APA are fair and reasonable and may not be avoided under Bankruptcy Code section 363(n).

D.     The Purchaser has and will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the APA and is entitled to all the benefits and protections of Bankruptcy Code section 363(m).  Cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rule 6004(g).

## IV.     Highest or Best Offer

A.     Prior to selecting Purchaser, the Debtor diligently and in good faith attempted to secure the highest and otherwise best offer for the Purchased Assets.

B.     The APA constitutes the highest or best offer for the Purchased Assets, and will provide a greater recovery for the Debtor's estates than would be provided by any other available alternative. The Debtor's determination that the APA constitutes the highest or best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtor's business judgment.

C.     The APA represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of this chapter 11 case.  No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtor's estate than the Purchaser.

D.     Good and sufficient reasons for approval of the APA and the Sale have been articulated.   Approval of the Sale Motion and the APA and the consummation of the

transactions contemplated thereby is in the best interests of the Debtor, its creditors, its estate, the public and other parties in interest.

E.     A sale of the Purchased Assets is the only viable alternative for preserving and capturing the maximum value of the Purchased Assets.

F.     The Sale must be approved and consummated promptly in order to preserve the value of the Purchased Assets.

## V.    No Fraudulent Transfer

A.     The consideration provided by the Purchaser pursuant to the APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

## VI.    Validity of Transfer

A.     The Debtor (i) has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and the Sale of the Purchased Assets by the Debtor has been duly and validly authorized by all necessary corporate action, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the APA, (iii) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtor of the transactions contemplated thereby, and (iv) requires no further consents or approvals, other than those expressly provided for in the APA or otherwise explicitly set forth herein, to consummate the transactions.

B.     The transfer of each of the Purchased Assets to the Purchaser (i) will be as of the date of the closing (the "Closing") of the sale (the "Closing Date"), (ii) will be a legal, valid, and effective transfer of such assets, and (iii) vests or will vest the Purchaser with all right, title,

6

and interest of the Debtor to the Purchased Assets free and clear of all Liens and Claims (as defined below) accruing, arising or relating thereto any time prior to or resulting from the Closing.

## VII. Section 363(f) is Satisfied

A.     The sale complies with Section 363(f) of the Bankruptcy Code.  The sale, transfer and assignment of the Purchased Assets to the Purchaser shall be free and clear of all Liens and Claims (as defined in paragraph 15 below), subject to the Permitted Exceptions (as defined in paragraph 10 of the APA).

B.     The Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby (by paying the Purchase Price) if the sale of the Purchased Assets to the Purchaser were not free and clear of all Liens and Claims of any kind or nature whatsoever (subject to the Permitted Exceptions), or if the Purchaser would, or in the future could be liable for any of such Liens and Claims.

C.     The Debtor may sell the Purchased Assets free and clear of all Liens and Claims (subject to the Permitted Exceptions) against the Debtor, its estate or any of the Purchased Assets because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens and Claims against the Debtor, its estate any of the assets comprising the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Liens and Claims who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Liens and Claims, if any, in each instance against the Debtor, its estate or any of the Purchased Assets, attach to the cash proceeds of the Sale ultimately

attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

## VIII.  No Successor Liability

Except for the Assumed Liabilities (as defined in section 3 of the APA), the transfer of the Purchased Assets from the Debtor to the Purchaser does not and will not subject the Purchaser or its affiliates, successors and assigns or its respective properties (including the Purchased Assets) to any liability for Liens and Claims against the Debtor or the Debtor's interests in such Purchased Assets by reason of such transfer under the laws of the United States or any state, territory or possession thereof or the District of Columbia, applicable to such Sale, including, without limitation, any bulk transfer laws, successor liability or similar theories.  The Purchaser is not a continuation of the Debtor or its respective estate and there is no continuity between the Purchaser and the Debtor. The Purchaser is not holding itself out to the public as a continuation of the Debtor or its respective estate and the Sale does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtor.  Notwithstanding the foregoing, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtor under any state law successor liability doctrine with respect to any liabilities under environmental laws or regulations for penalties for violations prior to entry of this Order.

**NOW, THEREFORE, THE COURT HEREBY ORDERS, ADJUDGES AND DECREES THAT:**

### General Provisions

1. The relief requested in the Sale Motion is granted and approved, and the Sale contemplated thereby is approved as set forth in this order.

2. All of the findings of fact and conclusions of law set forth above are incorporated herein by reference, and the Sale Motion, as modified by any announcements in open court, is granted, as provided herein.

**Approval of APA**

3. The APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved and authorized.

4. The transfer of the Purchased Assets by the Debtor to Purchaser upon Closing and payment of the Purchase Price will be a legal, valid and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any entity (as defined in section 101(15)) of the Bankruptcy Code.

5. The Debtor has demonstrated both: (a) good, sufficient and sound business purposes and justification; and (b) compelling circumstances for the sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code.

6. Good and sufficient reasons exist for approval of the sale of the Purchased Assets to Purchaser under the terms of the APA. The relief requested in the Sale Motion is in the best interests of the Debtor, its creditors, the public and the Debtor's estate.

7. The transfer of the Purchased Assets to Purchaser pursuant to the APA will be a legal, valid, and effective transfer of the assets, and vests the Purchaser with good and indefeasible title to the Purchased Assets free and clear of all Liens and Claims (except for the Permitted Exceptions) and any such Liens and Claims which existed prior to the Closing shall attach to the proceeds of the Sale in the same order and priority as existed before the Sale

pursuant to 11 U.S.C. § 363(f), subject to any rights, claims and defenses of the Debtor or other parties in interest.

8.      Any Liens or Claims for unpaid Taxes (as defined in the APA), including any Liens or Claims pursuant to M.C.L. 205.27a, will attach to, and be paid from, the proceeds of the sale of the Purchased Assets, and the Purchased Assets will be sold free and clear of any Liens or Claims for unpaid Taxes, and Purchaser shall not be liable for such Liens or Claims for unpaid Taxes, including, without limitation, any liability pursuant to M.C.L. 205.27a.

9.      The transfer of the Purchased Assets is in exchange for consideration being paid by the Purchaser that constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

10.      The transfer of the Purchased Assets does not and shall not subject the Purchaser to any liability for Liens and Claims  by reason of such transfers and assignments under the laws of the United States, any state, territory or possession thereof of the District of Columbia based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any theory of successor or transferee liability, and all creditors and parties-in-interest are prohibited from asserting such claims against Purchaser or Purchaser's Affiliates.

11.      Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the rights and protections afforded thereby.

12.      There has been such notice as is appropriate in the particular circumstances given to all entities required by law to receive notice of the Sale and such opportunity for hearing as is appropriate in the particular circumstances and no further notice is necessary.

13.     The Purchased Assets have been adequately marketed and may lose value absent a prompt sale.

14.     All of the requirements of sections 105 and 363 of the Bankruptcy Code for a sale free and clear of all Liens and Claims have been met.

**Sale**

15.     Except for the Purchaser's liability to pay the Purchase Price and satisfy its other obligations set forth in the APA, the Sale, transfer and assignment of the Purchased Assets to the Purchaser upon the Closing shall be free and clear of all Liens and Claims (subject to the Permitted Exceptions), which include, but are not limited to: (1) all rights, interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise, mortgages, deeds of trust, security interests, charges, mechanics liens, liabilities, guarantees, pledges, liens, claims, judgments, demands, easements, encumbrances, defects, obligations, options, restrictions of all kinds, any claims under any contract or statute or in tort, right of first refusal, right of setoff, all claims that the Purchaser is the successor in interest to the business or liabilities of the Debtor as it relates to the Purchased Assets, (2) any post-petition administrative claims in the Debtor's bankruptcy case; (3) any claims arising as a result of any employment, pension, welfare, retirement, severance, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of Debtor; (4) any other employee claims, worker's compensation, discrimination, occupational disease, unemployment or disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the

Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, as amended, (c) Title VII and all other provisions of the Civil Rights Act of 1964, as amended, (d) the Federal Rehabilitation Act of 1973, as amended, (e) the National Labor Relations Act as amended, (f) the Worker Adjustment and Retraining Act of 1988, as amended, (g) the Age Discrimination and Employee Act of 1967, as amended and Age Discrimination in Employment Act and Older Workers Benefits Protection Act, each as amended, (h) the Americans with Disabilities Act of 1990, as amended, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) any state discrimination and employment laws, (k) state unemployment compensation laws or any other similar state laws, (l) the Family Medical Leave Act of 1993, as amended, (m) the Elliott-Larsen Civil Rights Act, as amended, (n) the Equal Employment Opportunity Acts of 1972, as amended, or (o) any other state or federal benefits or claims relating to any employment with the Debtor or any of their respective predecessors; (5) any claims under bulk sales or similar law; (6) any claims or liabilities under any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended and MCL 205.27a, and any Taxes of Debtor and all liabilities with respect thereto, including without limitation, all federal Taxes and Taxes owing to the state of Michigan and any other Government Authority; (7) claims of any other governmental entities; (8) all liabilities, Claims and Liens under any theories of successor liability; (9) any environmental law(s) or environmental, health, and safety Liabilities; (10) any claims of the EPA or Michigan Department of Environmental Quality asserted against Debtor with respect to any environmental contamination associated with any real property of the Debtor, or the Purchased Assets; (11) any claims for product liability; (12) all "claims" as defined under section 101(5) of the Bankruptcy code; and (13) any other liability, claim or interest, including, without limitation, liens, claims, encumbrances, causes of

action or interests that purport to give to any party a right or option to effect any forfeiture, modification, or termination of the Debtor's or the Purchaser's interest in or possession of the Purchased Assets or to impose any liability upon the Purchaser as result of the acquisition of the Purchased Assets and/or consummation of the transactions under the APA (for avoidance of doubt, all of the matters described in the foregoing (1) through (13) are collectively referred to herein as "Liens and Claims"). Upon the Closing and payment of the Purchase Price, holders of all such Liens and Claims shall be permanently enjoined from asserting such Liens or Claims against the Purchased Assets and the Purchaser. All Liens and Claims shall attach to the Sale Proceeds with the same extent, validity and priority as they had with respect to the Purchased Assets prior to Closing, subject to the terms of the escrow agreement and the APA which provide for the escrow of the Deposit be held and disbursed to Debtor and Purchaser following the Closing in accordance with the provisions of the APA.

16. The transfer of the Purchased Assets to the Purchaser will not subject the Purchaser to any liability by reason of such transfer under the laws of the United States, and state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law, including, without limitation, any Liens or Claims, any theory of antitrust or successor or transferee liability or otherwise.

17. The consummation of the transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

18. The Debtor has and shall convey to Purchaser good and marketable title to the Purchased Assets, free and clear of all Liens and Claims (subject to the Permitted Exceptions).

19.     Purchaser shall have no obligation to cure any pre-Closing defaults by Debtor relating to the Purchased Assets and that the exclusive remedy available to any party asserting such pre-Closing default shall be to pursue a claim against the Debtor in this Court.

**Injunction**

20.     Except as expressly permitted by the APA or by this Order, all persons and entities, including, but not limited to, the pre-petition lender, all creditors, equity security holders, governmental, tax and regulatory authorities, and other persons holding Liens and Claims against or in the Debtor or the Debtor's interests in the Purchased Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this case, whether by agreement, understanding, law , equity or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, the Debtor's business before the Closing or the transfer of the Debtor's interest in the Purchased Assets to the Purchaser, shall be forever barred, stopped and permanently enjoined from asserting, prosecuting or otherwise pursing Liens and Claims against the Purchaser or its property (including the Purchased Assets). Except as expressly provided in the APA, following the Closing, no holder of a Lien and Claim against the Debtor shall interfere with Purchaser's title to or use and enjoyment of the Purchased Assets, and all such Liens and Claims, if any, shall be and hereby are transferred to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they have against such Purchased Assets as of the Closing, subject to the Permitted Exceptions, and any other rights, claims and defenses that the Debtor's estate and Debtor, as applicable, may possess with respect thereto.

**Miscellaneous**

21.     Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) execute, deliver, perform under, consummate and implement, the APA (subject to the applicable closing conditions set forth in the APA), collectively with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, (ii) close the Sale as contemplated by the APA and this order; and (iii) take all further actions as may be requested by Purchaser for the purpose of transferring the Purchased Assets to Purchaser or as may be necessary or appropriate to the performance of the obligations contemplated by the APA.

22.     This order shall be binding in all respects upon the Debtor, including the Debtor, its estate, all holders of equity interests in any Debtor, all holders of any Liens and Claims, (whether known or unknown) against any Debtor, any holders of Liens or Claims against or on all or any portion of the Purchased Assets, the Purchaser and all successors and assigns of the Purchaser, the Purchased Assets and any trustee, if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtor's case.  This order and the APA, shall inure to the benefit of the Debtor, its estate and creditors, the Purchaser, and their respective successors and assigns.

23.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) the chapter 11 case, (ii) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (iii) any related proceeding subsequent to entry of this order, shall conflict with or derogate from the provisions of the APA or the terms of this order.

24.     On the Closing, this order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets or a bill of sale transferring good and marketable title in the Purchased Assets to

Purchaser free and clear of all Liens and Claims. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

25. Subject to the occurrence of the Closing, this order: (a) is and shall be effective as a determination that all Liens and Claims of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected and that no further filings are necessary to give effect to Section 16.3(iv) of the APA; and (b) shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets. Notwithstanding that no such filings are necessary for the Purchased Assets to be sold free and clear of Liens and Claims in accordance with this Order and the APA, the Debtor and the Purchaser are authorized to file any termination statements required to terminate of record any liens on the Purchased Assets.

26. Each of the Debtor's creditors is authorized and directed on or before the Closing to execute such documents and take all other actions as may be necessary to release its Liens in or Claims against the Purchased Assets, if any, as such Liens or Claims may have been recorded or otherwise existed.

27.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

28.     The failure specifically to include any particular provisions of the APA in this order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA be authorized and approved in its entirety.  Likewise, all of the provisions of this order are nonseverable and mutually dependent.

29.     The Debtor is authorized and empowered to take all actions necessary to implement the relief granted in this order.

30.     Notwithstanding the possible applicability of Fed.R.Bankr.P. 6004(g), 7062, 9014 or otherwise, the terms and conditions of this order shall be immediately effective and enforceable upon its entry and the Debtor and Purchaser are authorized to close the Sale immediately upon entry of this order.

31.     This Bankruptcy Court retains jurisdiction with respect to all matters arising from or related to the implementation of this order, including, without limitation, jurisdiction (i) to interpret and enforce the provisions of the APA, and any related agreement to which the Debtor and Purchaser are parties, (ii) to interpret and enforce this Order; (ii) to protect the Purchaser against any claims or other liabilities related to the transactions contemplated by the APA or otherwise, in accordance with the provisions of the APA; and (iii) resolve any and all objections to, or disputes among the parties to the Purchaser Agreement regarding, all issues or disputes with respect to claims for indemnification or otherwise under the APA.

32.     As a result of the Closing of the Sale, the Purchaser shall have no successor, derivative or vicarious liabilities of any kind or character, including, but not limited to, federal, state or other tax liabilities, liabilities based on any theory of successor or transferee liability, antitrust, environmental, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, de facto merger or substantial continuity, with respect to the Debtor or any obligation of the Debtor, including, but not limited to, in the case of liabilities on account of any extra taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the Purchased Assets prior to the Closing or any taxes in connection with, or in any way relating to the cancellation of debt of the Debtor or its affiliates.

Dated

SO ORDERED

_____
United States Bankruptcy Judge

## Exhibit 2

**(Notice And Opportunity to Object)**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-------------------------------------------------------------- x

In re:                                  )
                                        )     Chapter 11
**BIOFUEL INDUSTRIES GROUP, LLC,**      )     Case No. 11-_____
                                        )     Hon. _____
                Debtor.                 )
-------------------------------------------------------------- x

## NOTICE AND OPPORTUNITY TO OBJECT TO:

## MOTION OF THE DEBTOR AND DEBTOR IN POSSESSION FOR ENTRY OF:

**(III) A "SALE PROCEDURES ORDER" (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING CERTAIN BIDDING PROTECTIONS, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE BIDDING PROCEDURES HEARING, THE AUCTION AND THE SALE HEARING, AND (D) SCHEDULING AN AUCTION AND THE SALE HEARING; AND**

**(IV) A "SALE APPROVAL ORDER" AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES EXCEPT FOR CERTAIN ASSUMED LIABILITIES**

PLEASE TAKE NOTICE THAT the captioned Debtor (the "Debtor") has filed its motion for entry of a "sales procedure order" and entry of a "sale approval order" (the "Motion").

**Your rights may be affected. You may wish to review the Motion and discuss it with your attorney, if you have one in this bankruptcy case. (If you do not have any attorney, you may wish to consult one.)**

If you wish to object to the Court granting the relief sought in the Motion, or if you want the Court to otherwise consider your views on the Motion, within twenty-one (21) days of service of the Motion, **or such shorter time as the Court may hereafter order and of which you may receive subsequent notice**, you or your attorney must:

1.  File with the Court a written response, explaining your position at:[5]

United States Bankruptcy Court
211 West Fort Street, Suite 2100
Detroit, Michigan 48226

If you mail your response to the Court for filing, you must mail it early enough so the court will **receive** it on or before the date above.

You must also mail a copy to:

**Carson Fischer, P.L.C.**
Robert A. Weisberg, Esq.
Christopher A. Grosman, Esq.
4111 Andover Road, West – 2nd Floor
Bloomfield Hills, Michigan 48302

If a response is timely filed and served, the Clerk will schedule a hearing on the Motion and you will be served with a notice of the date, time and location of the hearing.

**CARSON FISCHER, P.L.C.**

*/s/ Christopher A. Grosman*
Robert A. Weisberg (P26698)
Christopher A. Grosman (P58693)
4111 Andover Road
West - Second Floor
Bloomfield Hills, Michigan 48302
Telephone: (248) 644-4840
Facsimile: (248) 644-1832
E-mail: RWeisberg@CarsonFicher.com
CGrosman@CarsonFischer.com

Dated: May 23, 2011
*Proposed Counsel for the Debtor and Debtor In Possession*

---

[5] Response or answer must comply with F.R. Civ. P. 8(b), (c) and (e).

**<u>Exhibit 3</u>**

**(Certificate of Service to be Filed)**

**Exhibit 4**

**(Asset Purchase Agreement)**

# ASSET PURCHASE AGREEMENT

THIS AGREEMENT, dated for reference purposes as of the _____ day of May, 2011 ("Agreement"),between BIOFUEL INDUSTRIES GROUP, LLC, a Michigan limited liability company ("Seller") and LQM Ventures LLC, a Delaware limited liability company or its designee ("Purchaser"). Purchaser and Seller are collectively referred to as the "Parties".

## WITNESSETH:

1.     <u>SALE AND PURCHASE OF ASSETS.</u> On the terms and subject to the conditions herein expressed, Seller agrees to sell, convey, transfer, assign, set over and deliver to Purchaser on the Closing Date, and Purchaser agrees to purchase and accept, all of the right, title and interest in and to all assets, properties and interests of the Seller relating to the Next Diesel Biodiesel Plant which is situated on a 25 acre lot (the "Project") of every kind, character and description, whether tangible, intangible, real, personal or mixed, wherever located (the **"Purchased Assets"**), including the following:

(a)    that certain real property upon which the Project is located which is owned by Seller at 1578 West Beecher Road, Adrian, Michigan, and legally described on <u>Exhibit A</u> attached hereto and incorporated by reference herein, together with all of the improvements, easements, rights of way or uses, privileges, licenses, all development/air rights and other rights appurtenant to the property, along with and including all mechanical, electrical, heating, air conditioning and plumbing systems, fixtures and equipment (collectively, the "Property");

(b)    all other machinery, equipment, fixtures and personal property of every kind and character, and all accessories and additions thereto, owned by Seller and located in or on the Property; or utilized in connection with and/or necessary in connection with operating the Project, if any ("Personal Property");

(c)    all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Project, if any, and only to the extent that they may be transferred or assigned ("Permits");

(d)    all warranties or guaranties, if any, applicable to the improvements, to the extent such warranties or guaranties are assignable in connection with the Project (the "Warranties");

(e)    all patents, patent applications, patent rights, trademarks, trademark applications, trade names, product names, service marks, copyrights, copyright applications domain name registration, know-how and other intellectual property related to the Project (the "Purchased Intellectual Property"); and

NYACTIVE-11993238.10

(f)     all contracts listed on Schedule 1(f) (the **"Contracts"**). The Purchaser shall have the right to exclude any contract by giving notice to Seller and the counterparty to such contract three (3) business days prior to the Closing; and

(g)     All deposits held by utility companies on the Closing Date ("Utility Deposits").

2.     <u>PURCHASE PRICE.</u>

2.1     Purchaser agrees to pay as the purchase price (the "Purchase Price") for the Purchased Assets the sum of US$2,000,000.00 (Two Million Dollars and no cents), plus, (i) the Pre-Closing Taxes (as hereinafter defined), (ii) the real estate transfer taxes and recording fees (as provided at Sections 23(a) and (b) herein), (iii) the title insurance premium (as provided in Section 23(c) herein), (iv) sales tax as provided in Section 23 (e) herein, and (v) assumption of the Assumed Liabilities on the following terms. The items set forth in 2.1(i), (ii), (iii), (iv) and (v) shall be added to the Purchase Price.

(a)     The sum of $200,000.00 earnest money (the "Deposit"), to be paid by Purchaser to Purchaser's counsel to be held in an escrow IOLA account upon Purchaser's execution hereof. Receipt of the Deposit shall be confirmed by Purchaser's counsel.

(b)     The remaining balance of the Purchase Price, subject to any closing adjustments and prorations and after crediting the Deposit, shall be paid in cash or immediately available funds at the Closing.

2.2     Purchaser shall have the right, in its sole discretion, to allocate the Purchase Price for the Purchased Assets for tax purposes and otherwise.

2.3     All Taxes with respect to the Purchased Assets for periods beginning before or on the Closing Date and ending after the Closing Date (the **"Pre-Closing Taxes"**) shall be prorated based on the number of calendar days in the taxable period before and after the Closing Date; provided however, Purchaser shall pay all Pre-Closing Taxes, which are estimated to be $57,500, and added to the Purchase Price.

3.     <u>ASSUMPTION OF ASSUMED LIABILITIES.</u> On the terms and subject to the conditions herein expressed, Purchaser shall assume and thereafter will pay, perform and discharge in accordance with their respective terms, as and when due, only the following (collectively, the **"Assumed Liabilities"**):

(a)     all Liability under the Contracts designated by Purchaser prior to Closing, and Permits whether arising prior to or after the Closing Date;

(b)     all liability related to taxes ("Taxes") of the Project for any period from and after the Closing Date;

2

NYACTIVE-11993238.10

4.    **APPORTIONMENTS**

The following apportionments shall be made between the Seller and Purchaser as of the Closing Date (the **"Closing Apportionments"**) based on the latest available information, and the amounts derived therefrom shall be (as applicable) added to or deducted from the Purchase Price:

(a)    Purchaser and the Seller agree to use their respective reasonable efforts to arrange, before the Closing Date, for separate billing to the Seller of all charges attributable to the period up to and including the date immediately preceding the Closing Date for electricity, water, gas, sewage and any other utilities servicing the Real Property (the **"Pre-Closing Utility Charges"**), and for separate billing to Purchaser for all such charges attributable to the period running from and after the Closing Date. If any such separate billing cannot be arranged by the Closing Date, such charges, including the Pre-Closing Utility Charges, shall be paid by Purchaser, provided the Pre-Closing Utility Charges do not exceed the Holdback (as hereinafter defined); provided, however, Purchaser shall be entitled to reimbursement of the Pre-Closing Utility Charges pursuant to Section 5.

5.    **HOLDBACK**

Upon receipt of the Purchase Price, counsel for Seller shall segregate and hold in a separate interest-bearing account (the **"Holdback Account"**), an amount equal to $10,000 (the "Holdback"). The Holdback shall be applied and released strictly as follows:

(a)    If the Pre-Closing Utility Charges are or have been paid by Purchaser, then as soon as reasonably practicable following the Closing Date but in no event later than 60 days thereafter, Purchaser and the Seller shall confer to determine in good faith the amount of the Pre-Closing Utility Charges and shall provide access to the other of any documentation relevant to the determination of such amount. Upon the determination of the Pre-Closing Utility Charges, but in no event later than 5 days thereafter, the Seller shall deliver to the Purchaser from the Holdback Account an amount equal to the Pre-Closing Utility Charges by wire transfer of immediately available funds.

(b)    Notwithstanding anything to the contrary herein, in no event shall the Seller be required to make any payment to the Purchaser pursuant to this Section 5 in excess of the amounts then remaining in the Holdback.

(c)    Any amount remaining in the Holdback 90 days following the Closing Date that is not subject to a claim by Purchaser pursuant to this Section 5, shall be released to the Seller from the Holdback Account and held by Seller pending further order of the Bankruptcy Court..

3

## 6. TERMINATION

This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing (the effective date of such termination, the "**Termination Date**"):

    (a)    by mutual written consent of Purchaser and the Seller;

    (b)    immediately upon receipt of Notice from Purchaser or the Seller, (i) if any of the conditions in Sections 16, 17.1 and 24 (if Purchaser is the terminating Party) or (ii) Section 17.2 and 24(a) (if the Seller is the terminating Party) have not been satisfied by the Outside Date, or (iii) if satisfaction of any such conditions is or becomes impossible, in each case other than through the failure of the terminating Party to comply with such Party's obligations under this Agreement by such date;

    (c)    by Purchaser if there shall be a material breach by the Seller of any representation or warranty or any covenant or agreement contained in this Agreement, and which breach cannot be cured or has not been cured by 10 Business Days after the giving of written Notice of such breach;

    (d)    by Purchaser or the Seller, if (i) Purchaser is not approved as the purchaser of the Purchased Assets or (ii) any person or entity (other than Purchaser) is selected and approved by the Bankruptcy Court at the Sale Hearing as the purchaser of the Purchased Assets or any part thereof;

    (e)    by Purchaser for any reason during the Due Diligence Period (as hereinafter defined);

    (f)    by Purchaser upon a DIP Event of Default (as hereinafter defined) and as set forth at Section 18(f).

Upon any termination, the Party effecting such termination shall deliver Notice thereof to the other Party as promptly as practicable.

    7.    **DEPOSIT.** If the Closing is completed in accordance with the terms of this Agreement, Seller shall apply the Deposit to the balance of the Purchase Price at Closing. If Purchaser defaults under this Agreement, beyond any applicable notice and/or grace period, and fails or refuses to close the sale as provided in this Agreement, then Seller may retain the Deposit as liquidated damages for Purchaser's failure to close this sale in accordance with the terms of this Agreement. If Seller defaults under this Agreement beyond any applicable notice and/or grace period, and fails or refuses to close the sale as provided in this Agreement, or if this Agreement is terminated pursuant to Sections 6(a), (b) (i) or (iii), (c), (d), (e) or (f), 11, 14, 16, 17.1, 18(f) or 24, then the Deposit shall be returned to Purchaser. Any disputes relative to the disposition

4

of the Deposit shall be determined by the Bankruptcy Court (as hereinafter defined).

8. **BROKERS' FEES.** Each Party warrants that it has not dealt with any broker or other person in connection with the sale of the Purchased Assets in any manner that could give rise to a claim for commission or similar fee. Each Party agrees to indemnify and hold the other harmless against and from all claims for real estate or other commissions and other fees with respect to the procurement and closing of this Agreement made by any person with whom they have dealt other than as provided herein.

9. **CLOSING.** The date for closing the sale and purchase of the Purchased Assets (the "Closing") shall be the 3rd day after the Sale Order becomes a Final Order (both terms as hereinafter defined) as more fully described in Section 16 below, unless such date is a non-business day, in which case, the first business day thereafter ("Closing Date"). The Closing shall be held at the offices of Seller's attorney or the title company of Purchaser's choice ("Title Company") and may be done by mail in escrow or at such other time, date or place as the Parties may mutually agree. Seller and Purchaser agree not to unreasonably withhold their approval of Title Company's standard escrow instructions to the extent they are consistent with the terms of this Agreement. In the event of any conflict between the terms of this Agreement and the terms of Title Company's standard escrow provisions, the terms of this Agreement will control. At the Closing the parties will execute and deliver such affidavits and other closing documents reasonably necessary to transfer title to the Purchased Assets in accordance with this Agreement which Title Company may reasonably require].

10. **CONVEYANCE OF PURCHASED ASSETS.**

10.1   The Seller shall deliver to Purchaser at Closing an executed special warranty deed in recordable form conveying fee simple title to the Property to the Purchaser and the deliverables set forth below. Such title to the Property shall be conveyed by Seller to Purchaser as marketable and free and clear of all liens, claims and encumbrances subject solely to the following permitted exceptions ("Permitted Exceptions"):

(a)   Current unpaid taxes and assessments which are not yet a lien and not yet delinquent allocable for the period subsequent to the Closing Date;

(b)   Any matter of record not objected to, or otherwise waived in writing by Purchaser; and

(c)   Any matter which is or should have been revealed by an accurate survey of the property.

10.2   At the Closing, Seller shall also execute and deliver the following to Purchaser:

(a)   An assignment to Purchaser, without recourse or warranty, of all of the interests of Seller in the Property not conveyed pursuant to the

5

NYACTIVE-11993238.10

deed as set forth in Section 10.1 above.

    (b)    Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions to title other than Permitted Exceptions, and such additional documentation in form reasonably required by Purchaser's title insurance company.

    (c)    Any required tax returns therefor executed by Seller, unless Seller elects to have Purchaser pay any of such taxes and credits Purchaser with the amount thereof, along with Real Estate Transfer Tax Returns, Closings Costs, Fees and Disbursements of Counsel, etc.

    (d)    A bill of sale, executed by Seller, so as to convey to Purchaser all right, title and interest of Seller, if any, in and to the Personal Property (the "Bill of Sale").

    (e)    Assignments of the Intellectual Property, Warranties, Contracts and Permits and Utility Deposits.

    (f)    Any other documents explicitly required by this Agreement to be delivered by Seller.

    11.    <u>SURVEY</u>. Purchaser shall have the right to have the Property surveyed at Purchaser's expense. If the survey shows any discrepancies or conflicts in boundary lines and encroachments which in Purchaser's sole and absolute discretion might materially decrease the value or feasibility of the Project based on its current and intended use as determined by Purchaser in its sole and absolute discretion and which Seller is unable or unwilling to cure to Purchaser's satisfaction as determined in Purchaser's sole and absolute discretion, then Purchaser's sole remedy shall be to terminate this Agreement by notice to Seller, given no later than the termination of the Due Diligence Period, whereupon the Deposit shall be refunded, otherwise the defects shall be deemed to be waived. Purchaser will provide copies of any survey to Seller upon request at no cost.

    12.    <u>EVIDENCE OF TITLE</u>. Promptly after the execution of this Agreement by the parties, Seller shall deliver to Purchaser a commitment to issue a policy of title insurance to the Property at standard rates in the amount of the Purchase Price, continued through the Effective Date and deliver it to Purchaser for examination. It shall show good and marketable title in Sellers in conformity with this agreement, Michigan law and to the satisfaction of Purchaser's Title Company.

    13.    <u>POSSESSION</u>. Seller shall deliver possession of the Property and all other Purchased Assets to Purchaser at the time of Closing in the condition required by this Agreement.

    14.    <u>DUE DILIGENCE PERIOD</u>. Purchaser shall have until June 3, 2011 (the

6

"Due Diligence Period") within which to perform any studies or inspections it deems necessary or desirable on the Purchased Assets, including any environmental studies, and to terminate this Agreement within the Due Diligence Period if any conditions are deemed unsatisfactory to Purchaser in its absolute and sole discretion. Purchaser shall not perform any invasive or destructive testing or sampling of the Property (including drilling or boring) without the prior written consent of Seller, which consent will not be unreasonably withheld. Purchaser shall repair any damage caused to the Property by Purchaser's inspections if the Closing does not occur pursuant to the terms herein described. If Purchaser does not terminate this Agreement by giving written notice of such termination to Seller within the Due Diligence Period, then Purchaser shall be deemed to have accepted the Purchased Assets with any and all faults, defects, or conditions of the Purchased Assets thereon. During the Due Diligence Period, Seller will also give Purchaser access to any and all records located at the Property or elsewhere in Seller's possession or under Seller's control which concern the physical condition of the Purchased Assets, and any other information Seller actually has in its possession or control concerning the condition of the Purchased Assets. Purchaser takes the Purchased Assets in its present condition, "AS IS," without reliance upon any representation, warranty, opinion or statement of Seller, or any agent of Seller, not contained in this Agreement and, further, Purchaser affirmatively represents that neither Seller nor anyone on behalf of Seller has expressly or impliedly made or given any such representation, warranty, opinion or statement to Purchaser or anyone on Purchaser's behalf not specifically provided in this Agreement. Purchaser acknowledges that this Section is a material part of the consideration to be received by Seller under this Agreement, and that Seller has agreed to the Purchase Price by reason of such understanding. This representation by Purchaser shall survive Closing. Notwithstanding the expiration of the Due Diligence Period, Purchaser's right of access to the Property and to test the Purchased Assets shall continue through the Closing or termination of this Agreement.

15.  REPRESENTATIONS, AND WARRANTIES OF SELLER.

15.1  Environmental.

(a)  For the purposes of this Section 15, "Environmental Laws" shall include, but not be limited to, all federal, state, and local laws, regulations, ordinances, orders, or any other legal or administrative requirements of whatever nature, whether currently existing or hereafter amended or enacted, pertaining to the protection of the environment, the protection of the health or safety of persons or natural resources, or contamination or pollution to the environment, including, without limitation, the applicable provisions of: (i) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (ii) the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., (iii) the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq., (iv) the Clean Water Act, 33 U.S.C. § 1251 et seq., (v) the Clean Air

NYACTIVE-11993238.10

Act, 42 U.S.C. § 7401 *et seq.*, (vi) the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, (vii) the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, (viii) the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., and (ix) the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., and the regulations promulgated pursuant thereto, and all analogous state or local statutes.

(b)      For purposes of this Section 15, "Environmental Liabilities and Obligations" means any and all debts, losses, liabilities, claims (including claims defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations of any nature, whether known or unknown, disclosed or undisclosed, matured or unmatured, determined or undeterminable, on or off-balance sheet, fixed absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether or not resulting from third party claims and any reasonable out of pocket costs and expenses in connection therewith (including reasonable counsel's fees) arising from any impairment or damage to the environment or failure to comply with the Environmental Laws in connection with the prior or ongoing ownership or operation of the Project, including liabilities related to (i) the transportation, storage, use arrangement for disposal or disposal of substances that are classified, regulated or defined as "hazardous substances," hazardous wastes," "hazardous materials," "radioactive," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or otherwise regulated under the Environmental Laws or with respect to which liability or standards of conduct are imposed under Environmental Laws ("Hazardous Materials") or waste; (ii) the actual or threatened release, spill, emission, discharge, migration, leaking, pumping, injection, deposit or disposal of Hazardous Materials or waste into, onto or through the environment or within any building, structure, facility or fixture ("Release"), (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments, (iv) any other obligations imposed under the Environmental Laws with respect to the Project; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable law as a result of any the matters identified in clauses (i) –(iv) of this Section 15(b).

(c)      Environmental Matters.

     a.  The Seller and the Project are in material compliance with all applicable Environmental Laws and all approvals, authorizations, consents, notices, registrations, orders, variances, licenses, permits or certificates ("Permits") issued pursuant to Environmental Laws or otherwise and the Seller has no material Environmental Liabilities or Obligations and no facts

8

exist or events have occurred that could reasonably be expected to give rise to any such material Environmental Liabilities or Obligations.

b. Seller has obtained all Permits required under all applicable Environmental Laws necessary to operate the Project.

c. The Seller is not the subject of any outstanding order, injunction, judgment, decree, ruling, writ, assessment or arbitration award, whether temporary, preliminary or permanent ("Order") or contract, indenture, note, bond, loan, instrument, lease, license, purchase order, commitment or other agreement, and any amendment or modification thereto, whether written or oral ("Contract") with any Governmental Authority (which shall include any entity exercising executive, legislative, judicial or administrative functions of or pertaining to the United States or foreign federal, state, provincial or local government, any governmental authority, agency department, board, commission or instrumentality or political subdivision or regulatory authority thereof, and any US or foreign federal, state, provincial or local court or arbitrator of competent jurisdiction) respecting (i) Environmental Laws, (ii) any investigation, response, corrective action, monitoring, remedial or other action required under the Environmental Law or by a Governmental Authority to address a Release or threatened Release of Hazardous Materials ("Remedial Action") or (iii) any Release or threatened Release of a Hazardous Material.

d. The Seller had not received any written communication alleging that the Seller may be in violation of any Environmental Law or any Permit issued pursuant to Environmental Law, or may have any Environmental Liabilities or Obligations.

(d) To the best of Seller's knowledge, there are no (i) investigations of the Project, (ii) violations or claims against the Seller or the Project alleging violations of any Environmental Laws, or (iii) threatened investigations which would reasonably be expected to result in the imposition of any material liability pursuant to any Environmental Law.

15.2 Other. Notwithstanding anything contained to the contrary herein, Seller represents as follows:

(a) There is no action, proceeding or investigation pending or, to the best of Seller's knowledge and belief, contemplated or threatened by or against Seller which would affect the Seller's ability to sell the

9

premises as provided in this Agreement. To the best of Seller's knowledge, there are no bankruptcy proceedings pending, contemplated or threatened by or against Seller, except for the Bankruptcy Case to be filed and reflected at Section 16.1 herein.

(b)    The Seller has not received any written notice and has no knowledge that any pending or threatened eminent domain, condemnation or similar proceeding or conveyance in lieu thereof of all or any part of the Property is contemplated.

(c)    No person or entity has any right, option or right of first refusal to purchase the Property.

(d)    Seller is a Michigan limited liability company duly formed and in good standing under the laws of the State of Michigan and has the requisite power and authority to enter into and to perform the terms of this Agreement. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Seller. Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. Seller has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and consummate the transaction contemplated hereby. Subject to approval of this Agreement by the Bankruptcy Court (as hereinafter defined) and entry of the Sale Order, this contract and all obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this contract.

(e)    Neither the execution and delivery of this Agreement, nor the closing of the transaction contemplated hereby, violate any order or decree of any court, or any agreement to which the Seller is a party or to which any of the assets of Seller are subject.

(f)    Any and all permits, certificates, zoning, building, housing or safety, fire and health department approvals, and all other permits, approvals and licenses that have been issued, will be assigned to Purchaser at the Closing to the extent they are assignable, and to the extent Seller or its agents or employees has possession of such permits, approvals and licenses and they are not posted at the Property, the same shall be delivered to Purchaser at Closing.

(g)    Notwithstanding anything in this Agreement to the contrary, the Property shall be delivered to Purchaser as of the date of Closing, in vacant condition, free of all tenants and occupants.

10

NYACTIVE-11993238.10

(h)    Until the Closing or earlier termination of this Contract, Seller shall maintain the Project in a manner consistent with the manner in which Seller has maintained the Project prior to the date hereof.

(i)    Between the Effective Date and the earlier of the Closing Date or the Termination Date, the Seller shall keep in effect all policies of insurance currently maintained by the Seller to insure the Project and the Purchased Assets (collectively, the "Insurance Policies"). To the extent that the Insurance Policies insure against any loss, liability, claim, damage or expense resulting from, arising out of, based on or relating to occurrences arising on or after the Effective Date and prior to the Closing with respect to the Project or the Purchased Assets and permit claims to be made thereunder with respect to such losses, liabilities, claims, damages or expenses after the Closing, and Purchaser elects to proceed with the Closing pursuant to Section 25 herein, Seller shall use its commercially reasonable efforts to obtain an insurance certificate naming Purchaser as an additional insured under the Insurance Policies.

(j)    Except as set forth on <u>Schedule 15(j)</u>, the Seller has possession, custody and control over the Purchased Assets and, subject to further order of the Bankruptcy Court, the right to sell the Purchased Assets.

(k)    <u>Schedule 15(k)</u> sets forth a list of all of the material Permits in connection with the Project and unless otherwise specified in said schedule, the Seller is in compliance, in all material respects, with the terms of such Permits issued to it.

(l)    Except as set forth on <u>Schedule 15(l)</u> and for the Bankruptcy Case, which is to be filed by May 20, 2011, and other matters to be set forth in the Schedules and Statement of Affairs which shall be filed in the Bankruptcy Case at least ten (10) days prior to the end of the Due Diligence Period, there are no material claims pending or threatened against the Seller with respect to the Project or any of the Purchased Assets at law or in equity, or before or by any federal, state, municipal, or other governmental unit, commission, board, bureau, agency, or instrumentality, domestic or foreign involving an amount in excess of $10,000 or seeking injunctive relief.

(m)    <u>Schedule 15(m)</u> contains a true and complete list of all Insurance Policies in force with respect to the Project. True and complete copies of such Insurance Policies have been made available to Purchaser.

(n)    Except as set forth on Schedule 15(n), all Taxes imposed on the Purchased Assets required to have been paid by the Seller have

11

been paid. There are no liens for Taxes (other than for Taxes not yet due and payable or being contested in good faith by appropriate proceedings) upon any of the Purchased Assets.

## 16. BANKRUPTCY CONDITIONS.

16.1  Seller shall file a chapter 11 petition (the "Bankruptcy Case") in the Eastern District of Michigan (the "Bankruptcy Court") on or before May 20, 2011, and shall have duly filed with the Bankruptcy Court and served in accordance with Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure on or before May 23, 2011 (i) a motion (the "Procedures Motion"), in form and substance reasonably satisfactory to the Purchaser, seeking an order approving this Agreement (subject to higher or better offers), the Overbid Procedures and the Break Up Fee detailed in Section 16.2, and the DIP Loan as set forth in Section 18 of this Agreement (the "Procedures Order"), in form and substance reasonably satisfactory to the Purchaser, which Procedures Order shall have (A) been entered by the Bankruptcy Court and (B) become a Final Order; and (ii) a motion (the "Sale Motion"), in form and substance reasonably satisfactory to the Purchaser, seeking an order approving the consummation of the transactions contemplated by this Agreement (the "Sale Order"), in form and substance reasonably satisfactory to the Purchaser, which Sale Order shall have (A) been entered by the Bankruptcy Court and (B) become a Final Order on or before July 15, 2011.

16.2  <u>Overbid Procedures and Break-up Fee.</u>

(a)  Seller and Purchaser agree that overbidding procedures and break-up fee payments shall be governed by this Section 16.2 and included in the Procedures Order. No competing bid for the Purchased Assets will be accepted or approved by the Seller unless it is made pursuant to terms at least as favorable to Seller as those contained in this Agreement and provide an aggregate consideration having a value equal to at least the sum of (A) the Purchase Price, plus (B) the Break-up Fee (as hereinafter defined), (C) plus any outstanding and anticipated Advances (as hereinafter defined) under the DIP Loan (as hereinafter defined), plus (D) $100,000 (collectively, the "Initial Overbid"). Following an Initial Overbid, the subsequent bid increments shall be $25,000. If a competing bid is approved by order of the Bankruptcy Court, the Purchaser shall be paid a break-up fee of $60,000 (the "Break-Up Fee"), and the Deposit shall be returned forthwith. The Break-Up Fee and the outstanding amount due under the DIP Loan shall be paid to Purchaser upon the closing of any such competing bid. The Break-Up Fee shall constitute a first priority administrative claim of the Seller pursuant to § 503(b) of the Bankruptcy Code.

16.3 <u>Sale Order:</u>

(a) The Sale Order shall be reasonably satisfactory to Purchaser and among other things, shall:

(i) approve the terms and conditions of this Agreement and the sale of the Purchased Assets to Purchaser;

(ii) authorize the Seller to enter into the transactions contemplated by this Agreement;

(iii) provide that Purchaser shall have no obligations to cure any pre-closing defaults by Seller relating to the Purchased Assets and that the exclusive remedy available to any party asserting any such pre-closing default shall be to pursue a claim against the Seller in the Bankruptcy Court;

(iv) authorize the sale of the Purchased Assets to Purchaser pursuant to this Agreement and § 363(b) and (f) of the Bankruptcy Code, free and clear of all liens, claims and encumbrances against or other "interests" in the Purchased Assets within the meaning of § 363(f) of the Bankruptcy Code and otherwise free and clear of all other claims, encumbrances, liabilities and interests and also free and clear of claims for successor liability with all liens, claims and encumbrances transferred to the proceeds in rank and priority existing as of the date Seller files the Bankruptcy Case (the "Commencement Date");

(v) provide that the order is effective as a termination of any lien, claim, encumbrance, liability or interest in or on the Purchased Assets and that no further filings are necessary to give effect to Section 16.3(iv) above; and, notwithstanding the fact that no such filings will be necessary as a result of the foregoing, authorize the parties in interest to file any termination statements required to terminate of record any liens on the Purchased Assets;

(vi) provide that appropriate notice of sale of the Purchased Assets "free and clear" has been provided to all persons and entities holding existing claims, causes of action, claims, interests or liens of any kind;

13

(vii)    authorize Seller to consummate the transactions contemplated by this Agreement;

(viii)    determine Purchaser is a good faith purchaser and is entitled to the protections of Section 363(m) of the Bankruptcy Code; and

(ix)    if possible, determine that the transactions contemplated by this Agreement are exempt from all State, City and County mortgage, transfer, stamp or other similar taxes pursuant to 11 U.S.C. § 1146(c).

16.4   Final Order: *Final Order* means an order as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, move for a stay pending appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Purchaser or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order shall have been denied by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been taken and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

17.    **CLOSING CONDITIONS.**

17.1   Conditions to Obligations of Purchaser. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver) by Purchaser of the following further conditions:

(a)    Seller shall have filed the Bankruptcy Case and the Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case, in form and substance reasonably acceptable to Purchaser (including a finding that Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and waiving any stay that would otherwise be applicable pursuant to Bankruptcy Rules 6004(h)), and as of the Closing Date the Sale Order shall have become a Final Order;

(b)    Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(c)    the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date);

14

NYACTIVE-11993238.10

(d)    The Procedures Order shall have been filed on or before May 23, 2011, the Sale Order shall have been entered and have become a Final Order on or before July 15, 2011, and the Closing shall have occurred on or before July 22, 2011 (the "Outside Date"); and

(e)    Seller shall convey good and marketable title to the Purchased Assets, free and clear of all liens, claims, encumbrances and interests.

17.2  <u>Conditions to Obligations of Seller</u>.  The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)    Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it on or prior to the Closing Date;

(b)    the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and

(c)    the Bankruptcy Court shall have entered the Sale Order.

18.    <u>DIP LOAN.</u>

(a)  <u>*Loan*</u>. In the event Seller needs any funds for certain administrative expenses and to maintain and preserve the Project, as more fully set forth on the budget ("Budget") annexed hereto as <u>Exhibit B</u>, between the date hereof and the Closing Date in order to be able to sell and transfer the same to Purchaser pursuant to the terms hereof, Purchaser agrees, subject to the conditions set forth herein, to lend to Purchaser subsequent to the filing of the Bankruptcy Case (the "DIP Loan"), and to advance up to $60,000 (the "<u>Advances</u>") in the aggregate to Seller upon Seller's written requests therefor from time to time. Each request for Advances shall include details as to how such Advances are to be applied, which uses are subject to the Budget, and if no Event of Default (as hereinafter defined) has occurred and the request for Advance is in accordance with the Budget, Purchaser will fund such Advance as soon as practicable. Any material changes in the Budget shall be subject to Purchaser's prior written approval in its sole and absolute discretion. Seller shall promptly provide any additional financial and other information as Purchaser may request to enable Purchaser to evaluate each request for Advances. All such Advances shall bear interest at 6% per annum based on a 365 day year. All such Advances and accrued interest shall be added to the cash portion of the Purchase Price if the Closing occurs and the Purchased Assets are sold to Purchaser. In the event the Purchased Assets are sold to any other person or entity, the outstanding Advances, plus all accrued interest thereon, shall be repaid at the Closing.

15

(b)  _Collateral._ Sellers hereby grant to the Purchaser a continuing security interest in and lien upon each Seller's entire right, title and interest in and to all of the Purchased Assets whether now or hereafter existing or now owned or hereafter acquired and whether located on the Property or elsewhere (collectively, the "Collateral") to secure performance and payment of the Advances and accrued interest thereon. The security interest granted herein shall (i) continue in full force and effect until all of the foregoing have been indefeasibly paid in full or the transactions contemplated by this Agreement have been consummated with Purchaser, and (ii) be subordinate only to existing and properly perfected security interests in the Collateral as of the filing of the Bankruptcy Case ("Senior Secured Creditors").

(c)  _Filings._ The liens and security interests referred to herein shall be deemed valid and perfected by entry of the Procedures Order, which shall also approve the DIP Loan. Purchaser shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the lien and security interest granted by or pursuant to this Agreement, the Procedures Order or any other document related thereto. The Sellers agree to execute and deliver any and all documents reasonably requested by Purchaser to evidence the further Advances, interest rate and other terms hereof and security interests provided for herein although the parties agree that no such further written evidence is required.

(d)  _Priority._ Seller agrees that its obligations hereunder, including its obligation to repay the Advances, shall constitute an allowed superpriority administrative expense in the Bankruptcy Case pursuant to Section 364(c)(1), having priority over all administrative expenses of and unsecured claims against Seller now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, all administrative expenses of the kind specified in, or arising under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(e)  _Negative Covenants of Seller._ To induce Purchaser to make the Advances pursuant to this Agreement, Seller hereby covenants and agrees that so long as any of the Advances shall remain outstanding, Seller shall not:

(i)  Except for advances by Citizens Bank to preserve or maintain the Collateral upon two (2) business days notice to Lender (unless said expenditure is an emergency), enter into any lending or other financing arrangement with a third party other than the Purchaser without obtaining the Purchaser's prior written consent thereto (which consent may be withheld by Purchaser in its sole and absolute discretion);

(ii)  Other than perfected liens as of the date of this Agreement, create, incur, assume or suffer to exist any mortgage, deeds of trust, pledge, security interest, encumbrance, lien or charge of any nature upon or with respect to any of the Collateral; authorize the filing under the UCC of any jurisdiction a financing statement which names Seller as debtor covering any of the Collateral; or

16

sign any security agreement authorizing any secured party thereunder to file a financing statement against any of the Collateral for any indebtedness prohibited herein. Sellers further covenant and agree not to grant any similar negative pledge to any other lender;

(iii) Convey, sell, lease, assign, transfer, hypothecate or otherwise dispose of any of its now or hereafter acquired Collateral;

(iv) Create, incur, suffer to exist, assume, guaranty, endorse, become a surety, or otherwise become liable for the debt or other obligations of any other person or entity whether directly or indirectly, or make or incur any advance, purchase commitment, other obligation or loan for the direct or indirect purpose of paying or discharging any such obligations;

(v) At any time seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Procedures Order, except for modifications and amendments agreed to by the Purchaser in writing; and

(vi) Except as otherwise provided herein, at any time hereafter suffer to exist a secured claim or priority for any administrative expense or unsecured claim against the Seller (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code (whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment)) equal or superior to the priority of the Purchaser.

(f) *Events of Default.* The occurrence of any of the following shall, at the option of Purchaser, constitute a "DIP Event of Default" with respect to the DIP Loan and this Agreement:

(i) any representation or warranty of Seller made herein or in any other document related hereto or in any other writing given to Purchaser in connection with the Advances or the sale of the Purchased Assets shall have been misleading or incorrect in any material respect as of the time when the same shall have been made;

(ii) any default in the performance or observance of any term, covenant or agreement to be performed by Sellers in this Agreement or any document related hereto which default continues for a period of ten (10) days;

(iii) the sale, exchange, conveyance, assignment, transfer or other disposition or divestiture of Seller's title to any of the Collateral, or the mortgage or other conveyance of a security interest in, or other encumbrance on any of the Collateral or any interest therein, whether voluntary or involuntary, without Purchaser's prior written consent;

(iv) any merger, consolidation or sale or transfer of all or substantially all of the assets of the Seller without Purchaser's written consent;

NYACTIVE-11993238.10

17

(v)     the sale, exchange, transfer, assignment, encumbrance or disposition of any of the membership interests or other ownership interest of the Seller;

(vi)     the use of proceeds of the Advances for any purpose other than as set forth in the request submitted in connection with such Advance and as provided for in the Budget;

(vii)     if an order shall be entered by the Bankruptcy Court appointing, or the Seller shall file an application for an order seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(viii)     if an order shall be entered by the Bankruptcy Court converting the Seller's chapter 11 case to a chapter 7 case;

(ix)     if an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in the Seller's case which does not (i) contain a provision for payment in full in cash of all obligations hereunder on or before the effective date of such plan or plans upon entry thereof, and (ii) provide for the continuation of the liens and security interests granted to the Purchaser and priorities until such plan effective date;

(x)     if an order shall be entered by the Bankruptcy Court dismissing the Seller's Chapter 11 cases which does not contain a provision for payment in full in cash of all obligations hereunder upon entry thereof;

(xi)     if an order shall be entered by the Bankruptcy Court without the express prior written consent of the Purchaser, (i) to revoke, reverse, stay, modify, supplement or amend the Procedures Order or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Purchaser equal or superior to the priority of the Purchaser, or (iii) to grant or permit the grant of a lien on the Collateral;

(xii)     if an order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor against any of the Purchased Assets; or

(xiii)     the termination of this Agreement for any reason including, without limitation, pursuant to Sections 6, 17.1 and 24.

(g)     _Remedies._ Upon the occurrence of a DIP Event of Default, then in addition to any remedies available to Purchaser under applicable law and as otherwise provided for in this Agreement, Purchaser may take one or more of the following remedial steps in any order of priority:

(i)     Declare immediately due and payable the outstanding principal balance of the Advances, together with all accrued and unpaid interest, fees and other sums or expenses payable thereunder and hereunder and accordingly accelerate payment thereof without presentment, demand, notice of intention to accelerate, notice of acceleration or notice of any other kind, all of which are expressly waived;

18

NYACTIVE-11993238.10

(ii)     After notice to Senior Secured Creditors and a hearing, and subject to entry of an order of the Bankruptcy Court and the rights of Senior Secured Creditors, take any action at law or in equity against Seller (a) to collect the payments then due and thereafter to become hereunder, or (b) to enforce performance and observance of any obligation, agreement or covenant of Seller;

(iii)     After notice to Senior Secured Creditors and a hearing, and subject to entry of an order of the Bankruptcy Court and the rights of Senior Secured Creditors, exercise any and all rights and remedies provided for hereunder, in the Procedures Order or in other document related hereto, including without limitation, foreclosing upon the Collateral, exercising all UCC remedies and other remedies whether at law or in equity; and

(iv)     After notice to Senior Secured Creditors and a hearing, and subject to entry of an order of the Bankruptcy Court and the rights of Senior Secured Creditors, set-off against any of Seller's obligations to Purchaser, without notice or other action, any sum owed by Seller in any capacity to Purchaser whether due or not.

No remedy conferred in this Agreement or the other documents related hereto is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy conferred herein or now or hereafter existing at law or equity or by statute or otherwise.

(h)     Bankruptcy Court Approval. The DIP Loan shall be approved by either the Procedures Order or by a separate order, which in either event shall provide for a lien on the Collateral and grant superpriority status to the Advances consistent with Sections 18(b), (c) and (d), and be otherwise reasonably satisfactory to Purchaser.

19.     NOTICES.  Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "Notices") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, (b) when transmitted by facsimile machine, if followed by the giving of, pursuant to one of the other means set forth in this Section 19 before the end of the first Business Day thereafter, printed confirmation of successful transmission to the appropriate facsimile number of the addressee listed below as obtained by the sender from the sender's facsimile machine, (c) upon receipt, when sent by prepaid reputable overnight courier or (d) three (3) days after the date so mailed, if sent by certified mail, return receipt requested, postage prepaid, in all cases addressed to the party to be notified at its address set forth below or to such other address as such party shall have specified most recently by like Notice, as follows:

Seller, to:          Biofuel Industries Group, LLC
                     30600 Northwestern Hwy., Ste. 400
                     Farmington Hills, MI  48334

NYACTIVE-11993238.10

Attn: Terry J. Nosan

        Copy, to:         Carson Fischer, PLC
                          411 Andover Road
                          West Second Floor
                          Bloomfield Hills, MI 48302-1924
                          Attn: Robert Weisberg, Esq.

        Purchaser, to:    LQM Ventures LLC
                          c/o Enervation Advisors, LLC
                          84 Nesconset Highway
                          Port Jefferson Station, NY 11776
                          Attn: Paul G. Tantillo

        Copy to:          Crowell & Moring LLP
                          590 Madison Avenue, 20th Floor
                          New York, NY 10022
                          Attn: Michael V. Blumenthal, Esq.

   20.   BENEFIT. This Agreement shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

   21.   ENTIRE AGREEMENT; AMENDMENTS; COUNTERPARTS. This Agreement and the DIP Loan (including the Schedules and Exhibits thereto) set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original hereunder. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

   22.   TIME OF THE ESSENCE. Time shall be of the essence with respect to the performance by the Parties of their respective obligations hereunder.

   23.   EXPENSES. Except as otherwise provided herein, the parties shall be liable for expenses as follows:

        (a)   Real Estate Transfer Tax. Purchaser shall pay all real estate transfer taxes due by Seller as a result of this transaction under applicable state law, which amount will be added to the Purchase Price.

        (b)   Recording Fees. Purchaser shall pay any and all recording fees required by this transaction for the deed recording only, which will be added to the Purchase Price.

        (c)   Title Insurance. Purchaser shall pay.

                               20

NYACTIVE-11993238.10

(d)    Survey. Purchaser will pay the cost of any survey work ordered under Section 11, above. Seller shall endeavor to provide Purchaser with an existing survey, if available.

(e)    Sales Tax. Purchaser shall be responsible for and shall pay any sales tax due as a result of the transfer of any personal property in connection herewith and shall remit the same to Seller with the Purchase Price if such tax is required to be collected by Seller under applicable law, with all such sums to be added to the Purchase Price.

(f)    Due Diligence. Purchaser will pay all costs associated with its due diligence under Section 14 above, except as provided for therein.

(g)    Purchaser will be responsible for and shall pay the Pre-Closing Taxes, which shall be added to the Purchase Price.

(h)    Other Fees and Expenses. As to all other customary closing costs and expenses, each party shall pay its respective expenses, taxes, charges and liabilities incurred in connection with or arising out of the exercise of their respective rights or obligations under this Agreement and the transfer of title from Seller to Purchaser.

24.    DESTRUCTION OF PROPERTY. Upon acceptance of this Agreement by Seller, the risk of loss or damage to the Purchased Assets shall be borne by the Seller until Closing, during which time Seller shall continue to insure the Purchased Assets against loss, damage or destruction by fire with extended coverage endorsement. In the event of such loss, damage or destruction occurring prior to Closing, the parties shall have the following options:

(a)    If the damage to the Purchased Assets, as determined by the adjuster, exceeds 25% of the Purchase Price, then either party may elect to rescind this Agreement by giving the other party written notice of such election within twenty (20) days after the occurrence of such damage, loss or destruction, or the date of Closing, whichever is sooner, whereupon the Deposit shall be refunded to Purchaser and the parties shall have no further rights or obligations hereunder; or

(b)    At Purchaser's sole option, the parties shall proceed with Closing of the Purchased Assets in which event either (i) Purchaser shall receive a credit against the Purchase Price equal to the loss or damage sustained by the Purchased Assets, as determined by the insurance adjuster for Seller's carrier; or (ii) Seller shall assign to Purchaser all of Seller's rights in and to the insurance recovery due by reason of such loss or damage to the Purchased Assets, with no reduction in the Purchase Price.

21

NYACTIVE-11993238.10

25. ASSIGNMENT. Purchaser shall have the absolute right to assign this Agreement to an affiliate. Purchaser may assign, mortgage or sell this Agreement or its rights hereunder to an entity which is not an affiliate, by providing Seller not less than five (5) Business Days' prior written notice of such assignment prior to the date of Closing, provided (a) the Purchase Price and all terms hereunder are unaffected by such assignment, and (b) such assignee also agrees to extend the DIP Loan pursuant to the terms set forth in Section 18 herein.

26. DEFAULT; REMEDIES.

26.1 If Seller has performed or is ready, willing and able to perform all obligations required by this Agreement and Purchaser shall fail or refuse to perform this Agreement within the time and in the manner provided, then Seller may elect to terminate this Agreement by giving written notice thereof to Purchaser, and upon giving such notice, Seller's sole and exclusive remedy shall be to receive the Deposit as liquidated damages, the Parties recognizing that Seller's actual damages in the event of Purchaser's default will be difficult to ascertain.

26.2 Purchaser, in addition to all other remedies set forth in this Agreement, may seek specific performance of this Agreement in the event of default by the Seller.

27. CAPTIONS, HEADINGS, INTERPRETATION. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

28. GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of law that would provide for application of another law.

29. EFFECTIVE DATE. As used herein, the term "Effective Date" shall mean the last date of signature by the parties hereto.

22

NYACTIVE-11993238.10

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above, in multiple counterparts, each of which shall be deemed an original and all of which shall evidence but one agreement.

LQM VENTURES, LLC

By: _____
Name: Stefan Friedman
Title: Manager

BIOFUEL INDUSTRIES GROUP, LLC

By: _____
Name: Terry J. Nosan
Title: Authorized Manager

NYACTIVE-11993238.10

## EXHIBIT A

### Legal Description

The land referred to is situated in the State of Michigan, County of Lenawee and is described in the Annex attached hereto:

A-1

NYACTIVE-11993238.10

# EXHIBIT A
## LEGAL DESCRIPTION

The land referred to in this Commitment, situated in the County of Lenawee, City of Adrian, State of Michigan, is described as follows:

All that part of the Northwest 1/4 of Section 9, Town 7 South, Range 3 East, described as beginning at the North 1/4 corner of Section 9, aforesaid; thence South 00 degrees 39 minutes 55 seconds West 1183.56 feet along the North and South 1/4 line of said Section 9; thence South 81 degrees 31 minutes 53 seconds West 881.73 feet along the Northerly line of the Railroad right of way formerly known as Lake Shore and Michigan Southern Railroad; thence North 00 degrees 39 minutes 55 seconds East 1318.32 feet; thence South 89 degrees 40 minutes 39 seconds East 870.56 feet along the North line of said Section 9 to the point of beginning.

Tax Item No. XAO-109-1100-00

## EXHIBIT B

### Budget

| Hot Idle Expenses: | Per Month | Months | Total | Grand Total |
|---|---|---|---|---|
| Security/Maintenance Contractor | 1600 | 3 | 4800 | |
| Comcast internet | 112 | 3 | 336 | |
| Verizon telephone | 170 | 3 | 510 | |
| Alarm monitoring fee | 118 | 3 | 354 | |
| Madison Twp. sewer | 50 | 3 | 150 | |
| City of Adrian water | 75 | 3 | 225 | |
| Consumers Energy electric | 2000 | 3 | 6000 | |
| Citizens Gas | 1000 | 3 | 3000 | |
| Lawn care and irrigation | 100 | 3 | 300 | |
| Supplies and Maintenance | 200 | 3 | 600 | |
| Property, Casualty & G/L insur. | 4000 | 3 | 12000 | |
| Miscellaneous | 500 | 3 | 1500 | |
| *Total Hot Idle* | *9925* | *3* | *29775* | *$29,775* |

| | | | | |
|---|---|---|---|---|
| *Miscellaneous Building Expenses* | | | | *$7,725* |
| *Mail initial filing to all parties* | | | | *$5,000* |
| *United States Trustee Fees* | | | | *$10,000* |
| *Creditors' Committee Counsel* | | | | *$7,500* |
| *Total Budget* | | | | *60,000* |

**Note 1**: Each individual line item disbursement may vary from the Budget by 20%, provided, however, in no event will the DIP Loan exceed $60,000, and no individual line item may be exceeded if it would cause other necessary expenses for hot idle and/or the building to go unpaid.

**Note 2**: To the extent that any of the foregoing budgeted items are advanced by a non-debtor person or entity (including Debtor's counsel) prior to approval of the post-petition financing, any order approving Debtor's post-petition financing entered in the case shall be deemed to include authority to reimburse any such non-debtor party for any such budgeted items so advanced.

## <u>SCHEDULE 15</u>

Items excluded from the Purchased Assets:

1.     Commercial filter system and controls located on plant floor and owned by Filter Technologies, LLC and/or Ann Arbor Financial, LLC

2.     Any railcars that may be temporarily on the property placed by Adrian Blissfield Railroad from time to time.

3.     Personal property of employees, former employees, or Seller's officers, members or managers.

4.     Cause of Action against GreenShift Corporation, its subsidiaries and/or affiliates.

Error! Unknown document property name.

B-1

## <u>SCHEDULE 15k</u>

Material Permits concerning the Project:

1.  MDEQ storm water discharge

    - Certificate of Coverage dated June 29, 2010 under NPDES General

Permit dated July 23, 2009, expires April 1, 2015

    - Authorization to Discharge dated December 12, 2006 (construction only - 

expires 5 years)

2.  MDEQ Waste and Hazardous Materials Facility Inspection

    - Approved final inspection letter August 23, 2007

3.  MDEQ Above Ground Storage Tanks

    - Approved inspection August 5, 2007

    - Approved inspection March 31, 2010

4.  State of Michigan Boiler Inspection

    - Certificate of inspection expired October 2010

    - Agreement to not operate until inspection done and insurance in place

5.  MDEQ Air Quality Permit

    - Air Permit Application filed February 21, 2007

    - Air Permit Exemption dated March 5, 2007 per rule 209(A)(I)

6.  MDEQ Site Identification Notification – Site ID # MIK 666986369

    - Initial Notice 6-25-07 Generator of non-acute hazardous waste and

B-2

Error! Unknown document property name.

**Liquid Industrial Waste**

          - Subsequent Notification 5-14-09 added Liquid Industrial Waste Designated Facility

7.       State motor fuel registrations (all discontinued February 28, 2011

          - Blender, Terminal Operator and Supplier

8.       EPA registration as 647312311 - Biodiesel producer as of June 21, 2007, voluntarily terminated August 14, 2009

9.       IRS registration 2007-001592-AB-NB for qualification as producer and importer of "AB" -- agri-biodiesel and "NB" -- biodiesel (other than agri-biodiesel) and renewable diesel

10.     City of Adrian back flow testing for water service

          - Inspection due June 25, 2010 was not performed (Approx cost $125.00)

B-3

Error! Unknown document property name.

## SCHEDULE 15I

Material Claims pending or threatened:

1.     Lien Foreclosure action pending in Lenawee County Circuit Court (Adrian, Michigan). Dynalectric v. Biofuel Industries Group, LLC and GS Cleantech Corp., an assignee of GreenShift Corporation was consolidated with Detroit Boiler v. NextDeisel/Biofuel Industries Group, LLC, Lenawee Circuit Ct. Case #09-3479-CK and LB of Whitmore Lake, Inc. v. Biofuel Industries Group, LLC case Lenawee Circuit Ct. Case #09-3321-CK (the latter was settled and dismissed with prejudice in February of 2010). Subsequently, GS Cleantech Corp. filed a crossclaim against Biofuel Industries Group, LLC and a third party complaint against Adrian Mechanical Services Co. Biofuel Industries Group, LLC filed a counter-claim against GS Cleantech Corp. and a third party complaint against GreenShift Corporation, GS Coes Yorkville I, LLC, Kevin Kreisler and Viridis Capital, LLC. The latter parties then filed a third party complaint aagainst Terry J. Nosan, Michael Horowitz, TerryJ. Nosan Declaration of Trust, Horowitz Investments, LLC and Nextfuels, LLC.

The case is in discovery and has been set for case evaluation on October, 2011 and trial in February of 2012.

B-4

Error! Unknown document property name.

## <u>SCHEDULE 15m</u>

Insurance policies in force related to the Project:

1.     Property and Casualty covered by Citizens Bank, senior lender. Seller does not

have copy of policy or certificate of coverage.

2.     All other coverage lapsed.

B-5

Error! Unknown document property name.

**<u>SCHEDULE 15n</u>**

Taxes and liens on Purchased Assets:

1.    Real and personal property taxes for 2009 and 2010 due to Lenawee County – $54,951.86 plus interest and penalties.

2.    State of Michigan Unemployment Insurance Agency Tax Lien dated 10/18/10 $2345.37

3.    Various claims of lien as set forth in litigation referenced in Schedule 15l.

B-6

Error! Unknown document property name.

**Exhibit 5**

**(Sale and Auction Notice)**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

------------------------------------------------------------- x
In re:                                          )
                                                )      Chapter 11
**BIOFUEL INDUSTRIES GROUP, LLC,**              )      Case No. 11-_____
                                                )      Hon. _____
                        Debtor.                 )
------------------------------------------------------------- x

## NOTICE OF (I) HEARING ON MOTION FOR APPROVAL OF SALE OF ASSETS AND (II) AUCTION OF ASSETS

*PLEASE TAKE NOTICE OF THE FOLLOWING:*

### Filing of Sale Motion

On May 23, 2011, the debtor and debtor in possession herein (the "Debtor") filed a motion [Docket No. ___] (the "Sale Motion") seeking, among other things, approval of (i) bidding procedures for the sale of substantially all of the Debtor's assets (the "Purchased Assets"), and (ii) the sale of the Purchased Assets.

### Entry of the Bidding Procedures Order

On May ____, 2011, the Court entered the *Order (A) Approving Bidding Procedures For The Sale Of Substantially All Of The Debtor's Assets, (B) Approving Certain Bidding Protections, (C) Approving The Form And Manner Of Notice Of The Bidding Procedures Hearing, The Auction And The Sale Hearing, And (D) Scheduling An Auction And The Sale Hearing* (the "Bidding Procedures Order") pursuant to which the sale and bidding procedures proposed in the Sale Motion for the sale of the Purchased Assets (the "Bidding Procedures") were approved by the Court.

### Opportunity For Auction Of Purchased Assets

An auction (the "Auction") for the Assets will be conducted on **[JUNE 22, 2011, STARTING AT 10:00 A.M.]** (prevailing Eastern Time) at Carson Fischer, P.L.C., 4111 Andover, West – Second Floor, Bloomfield Hills, MI 48302, or at any such other place, date and time as may be designated in writing by the Debtor. If you wish to participate

in the Auction, you must strictly comply with the Court approved Bidding Procedures contained in the Bidding Procedures Order. If no Qualified Bids (as defined in the Bidding Procedures Order are received by Debtor's counsel by **[June 8, 2011]** at 4:00 p.m. Eastern Time (the "<u>Bid Deadline</u>"), the Auction may be cancelled by the Debtor without further notice.

## Hearing On Approval Of Sale

A hearing will be held on the Sale Motion to approve the sale of the Purchased Assets before the Honorable _____, U.S. Bankruptcy Judge for the United States Bankruptcy Court, Eastern District of Michigan, 211 W. Fort Street, Detroit, MI, 48226, on **[June 23/24, 2011] at _____ __.m.**, or at such time thereafter as counsel may be heard or at such other time as the Bankruptcy Court may determine (the "<u>Sale Approval Hearing</u>"). The Sale Approval Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Approval Hearing.

At the Sale Approval Hearing, the Debtor will seek the Court's approval of the sale of the Purchased Assets to the Purchaser proposed in the Sale Motion (or to such other higher and better prevailing bidder at the Auction (as defined below), if any), free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, with all liens, claims and encumbrances to attach to the proceeds of the sale with the same validity and in the same order of priority as they attached to the Assets prior to the sale.

## Responses Or Objections To Sale Or Sale Motion

Any response or objection to the Proposed Sale or the Sale Motion must be filed with the U.S. Bankruptcy Court for the Eastern District of Michigan, 211 W. Fort Street, Detroit, MI, 48226, to be received by the Clerk of the Bankruptcy Court by 4:00 p.m. on **[June 17, 2011]** (the "<u>Objection Deadline</u>"). At the same time, you must also serve a copy of any response or objection upon the following parties: (i) counsel to the Debtor: Carson Fischer, P.L.C., 4111 Andover, West – 2nd Floor, Bloomfield Hills, Michigan, 48302 (Attn: Robert A. Weisberg, Esq. and Christopher A. Grosman, Esq.); (ii) counsel to the Official Committee of Unsecured Creditors: ___ (Attn: ___); (iii) counsel to the proposed Purchaser: Crowell & Moring LLP, 590 Madison Avenue, 20th Floor, New York, NY 10022-2524, (Attn: Michael V. Blumenthal); and (iv) the United States Trustee: The Office of the United States Trustee, 211 West Fort Street - Suite 700, Detroit, MI 48226.

## Request For Additional Information

All requests for information concerning the proposed sale, the Purchased Assets, or the Sale Motion should be directed in writing to Debtor's undersigned counsel.

**CARSON FISCHER, P.L.C.**

*/s/ Christopher A. Grosman*
Robert A. Weisberg (P26698)
Christopher A. Grosman (P58693)
4111 Andover Road
West - Second Floor
Bloomfield Hills, Michigan  48302
Telephone:  (248) 644-4840
Facsimile: (248) 644-1832
E-mail:  RWeisberg@CarsonFicher.com
　　　　CGrosman@CarsonFischer.com

Dated: May ___, 2011

*Proposed Counsel for the Debtor and Debtor In Possession*